IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARINER ENERGY, INC. AND    §
MARINER ENERGY RESOURCES, INC.,  §
                            §
     Plaintiffs,                   §
                            §    CIVIL ACTION NO. 4:08-cv-000658
vs.                          §    JURY DEMANDED
                            §
DEVON ENERGY PRODUCTION       §
CO., L.P.,                     §
                            §
     Defendant.              §

**PLAINTIFFS MARINER ENERGY, INC. AND MARINER ENERGY RESOURCES,
INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT
<u>AND BRIEF IN SUPPORT THEREOF</u>**

Bradley L. DeLuca
Federal Bar No. 11510
TBA No. 05653800
Brigid D. Ashcraft
Federal Bar No. 9033
TBA No. 01372450

**ATTORNEYS FOR PLAINTIFFS
MARINER ENERGY, INC. AND
MARINER ENERGY RESOURCES,
INC.**

OF COUNSEL:

JOHNSON DeLUCA KENNEDY & KURISKY, P.C.
4 Houston Center, Suite 1000
1221 Lamar Street
Houston, Texas 77010
(713) 652-2525 - Telephone
(713) 652-5130 - Facsimile

## TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................... iv

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS  ............................. vi

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW .......................... vii

SUMMARY OF ARGUMENT ................................................................. viii

INTRODUCTION ...............................................................................................1

FACTUAL BACKGROUND ...............................................................................1

UNDISPUTED FACTS ......................................................................................4

SUMMARY JUDGMENT EVIDENCE ..............................................................6

ARGUMENT AND AUTHORITIES ..................................................................6

    I.      Louisiana Law Applies to the Letter Agreement .....................................6

    II.    Mariner Is Entitled to A Declaratory Judgment That Limits Its'
           Liability For Plug And Abandonment/Decommissioning ......................8

          A.    The Letter Agreement ..................................................................8

          B.    The Twachtman Report ...............................................................10

    III.   Mariner Is Entitled To A Declaratory Judgment That It Is Not
           Liable For Storm Damage..........................................................................13

          A.    Devon Admitted That the Expenses at EI 333A
                Were for Storm Damage ...........................................................13

          B.    Under the JOA, Devon is Liable for Storm Damage .................15

    IV.   Mariner Is Entitled To A Declaratory Judgment That Devon
           Must Indemnify It For Storm Damages .................................................18

    V.    The Fact That Mariner Signed the Well and Platform Abandonment
           AFE's Does Not Mean That Mariner Is Obligated to Pay the
           Estimated Costs.........................................................................................21

CONCLUSION AND PRAYER ..................................................................................................24

CERTIFICATE OF SERVICE ..................................................................................................25

## INDEX OF AUTHORITIES

**CASES:**

*Amoco Production Co. v. Forest Oil Corp.,*
844 F.2d 251 (5th Cir. 1988) ..................................................................................6, 7

*Amoco Production Co. v. Sea Robin Pipeline Co.,*
844 F.2d 1202 (5th Cir. 1988) ....................................................................................19

*Amoco Production Co. v. Texas Meridian Resources Exp. Inc.,*
180 F.3d 664 (5th Cir. 1999) ..................................................................................... vii

*Chailland Business Consultants v. Duplantis,*
897 So.2d 117 (La. Ct. App. 2004).............................................................................7

*Dairyland County Mut. Ins. Co. v. Mason,*
460 S.W.2d 481 (Tex. Civ. App. – Beaumont 1970, writ ref'd n.r.e.) .........................23

*D.E.W., Inc. v. Local 93, Laborers' Intern. Union of North America,*
957 F.2d 196 (5th Cir. 1992) ..................................................................................... vii

*Dominion Exploration & Production, Inc. v. Ameron Intern. Corp.,*
2007 WL 4233562, (E.D. La.) ......................................................................................19

*EP Operating L.P. v. Placid Oil Co.,*
26 F.3d 563 (5th Cir. 1994) ..........................................................................................19

*Fluor Ocean Services, Inc. v. Rucker Co.,*
341 F. Supp. 757 (E.D. La. 1972)................................................................................19

*Jones v. Texas Gulf Sulfur Co.,*
397 S.W.2d 304 (Tex.Civ.App.—Houston [1st Dist.] 1965, writ ref'd n.r.e.) .............23

*Kee v. City of Rowlett,*
247 F.3d 206 (5th Cir. 2001) ...................................................................................... vii

*Naquin v. Louisiana Power & Light Co.,*
943 So.2d 1156 (La. Ct. App. 2006)............................................................................7

*Sheline v. Dun & Bradstreet Corp.,*
948 F.2d 174 (5th Cir. 1991) ...................................................................................... vii

*Shintech, Inc. v. Group Constructors, Inc.,*
688 S.W.2d 144 (Tex. App.- Houston [14th Dist.] 1985, no writ)................................22

iv

*Sonat Exploration Co. v. Mann,*
785 F.2d 1232 (5th Cir. 1986). ....................................................................................................22

*Southwest Craft Center v. Heilner,*
670 S.W.2d 651 (Tex. App.—San Antonio 1984, writ ref'd n.r.e.) .............................................23

*Texas Eastern Transmission Corp. v. Amerada Hess Corp.,*
145 F.3d 737 (5th Cir. 1998) (*citing* La.C.C. art 2050)...........................................................7, 12

**STATUTES:**

43 U.S.C. §1333..............................................................................................................................6

La. C.C. art. 2045............................................................................................................................7

La. C.C. art. 2046............................................................................................................................7

La. C.C. art. 2050............................................................................................................................7

La. C.C. art. 2053............................................................................................................................7

## STATEMENT OF NATURE AND STAGE OF PROCEEDING

Mariner Energy, Inc. and Mariner Energy Resources, Inc. (collectively "Mariner") filed suit against Devon Energy Production Co., L.P. ("Devon"), asserting claims for unjust enrichment and declaratory relief arising from a Letter Agreement between the parties. Devon answered the lawsuit and asserted counterclaims for breach of contract and declaratory relief based upon the same Letter Agreement.

During a scheduling conference before the Court, it was determined that the first phase of the litigation would solely involve contract interpretation of the Letter Agreement and attachments thereto. During this initial phase, discovery was to be conducted regarding the Letter Agreement and attachments thereto, after which, both parties would file Motions for Partial Summary Judgment. An Order to this effect was entered on June 30, 2008.

The parties recently completed discovery in the initial phase of the litigation. The Parties are now filing Motions for Partial Summary Judgment in accordance with the Court's Order.

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

**Issue 1:**

Whether the Letter Agreement limits Mariner's liability for plug and abandonment/decommissioning to the condition of Eugene Island 333A as of December 1, 2000 and by the work assumption/scope of work set forth in the Platform Decommissioning and Replacement Cost Estimates Report by Twachtman Snyder & Byrd, Inc.

**Issue 2:**

Whether Mariner is liable for storm damage at Eugene Island 333A.

**Issue 3:**

Whether Devon owes indemnity to Mariner for storm damages on Eugene Island 333A.

**Standard Of Review (Applicable To All Issues):**

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if it can establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). Summary judgment is appropriate where the only issue before the court is a question of law. *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

The interpretation of an unambiguous contract is a question of law. *Amoco Production Co. v. Texas Meridian Resources Exp. Inc.*, 180 F.3d 664, 668 (5th Cir. 1999). In contract interpretation cases, summary judgment is appropriate if the contract in question is unambiguous and can be given certain or definite legal meaning or interpretation. *D.E.W., Inc. v. Local 93, Laborers' Intern. Union of North America*, 957 F.2d 196, 199 (5th Cir. 1992). Neither party contends that the contract at issue is ambiguous.

## SUMMARY OF ARGUMENT

I.   **Mariner's Abandonment Liability Is Limited To The Condition Of The Block As Of The Effective Date Of The Letter Agreement And To The Scope Of Work Outlined In The Twatchman Report.**

Mariner's plug and abandonment/decommissioning liability on Eugene Island 333A ("EI 333A or the "Block") is limited to the conditions on the Block as of December 1, 2000, and to the scope of work outlined in the Twatchman Report. The expenses which Devon seeks to recover from Mariner, however, relate to changed property conditions caused by Hurricane Rita in September 2005 and a scope of work greatly in excess of that outlined in the Twatchman Report. Mariner is thus entitled to a declaratory judgment that its liability for plug and abandonment/decommissioning on EI 333A is limited to the conditions on the Block as of December 1, 2000, and to the scope of work outlined in the Twatchman Report.

II.  **Mariner Is Not Liable For Storm Damage.**

Mariner retained liability in the Letter Agreement solely for Abandonment Expenses. Devon now seeks to recover expenses related to storm damage, not abandonment. The EI 333 Operating Agreement provides that storm damages are borne by the working interest owners, which Mariner is not. Mariner is thus entitled to a declaratory judgment that it is not liable for storm damage on EI 333A.

III. **Devon Must Indemnify Mariner For Damages Sustained On The Block After The Effective Date Of The Letter Agreement.**

The Letter Agreement contains an indemnity clause which requires Devon to indemnify Mariner for damages sustained on the Block after December 1, 2000. Devon seeks to avoid the effect of this provision by arguing that the costs which it seeks to recover from Mariner relate to Abandonment Expenses, which are excepted from the indemnity provision. The true nature of these expenses, however, relate to storm damage. Mariner is entitled to a declaratory judgment

that Devon must indemnify it for storm damages sustained on the Block after December 1, 2000.

**IV.    Signing An AFE Does Not Create A Legally Binding Obligation.**

The signing of an AFE does not create a legally binding obligation on the signing party. Rather, it is well established in the oil and gas industry that an AFE is merely a non-binding estimate of costs.  Moreover, the fact that Mariner signed the AFEs did not cause Devon to do anything which it would not have done otherwise.  Thus, the fact that Mariner mistakenly signed the AFEs does not create an obligation for Mariner to pay the estimated costs.

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs Mariner Energy Inc. and Mariner Energy Resources, Inc. file their Motion for Partial Summary Judgment and Brief In Support Thereof pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in support thereof would show as follows.

## INTRODUCTION

1.     At the heart of the controversy is a Letter Agreement that relates to a property offshore Louisiana described as Block 333, Eugene Island Area, South Addition, Offshore Louisiana ("EI 333" or the "Block")[1].  The Letter Agreement sets forth the parties rights and obligations with regard to the operation and ultimate abandonment of EI 333.

2.     Mariner seeks declaratory relief via partial summary judgment as follows:

i)      That the Letter Agreement limits Mariner's liability for plug and abandonment/decommissioning to the condition of EI 333A as of December 1, 2000, and by the work assumption/scope of work set forth in the Platform Decommissioning and Replacement Cost Estimates report by Twachtman Snyder & Byrd, Inc. (the "Twachtman Report");

ii)     That Mariner is not liable for storm damage at EI 333A; and,

iii)    That Devon must indemnify Mariner for damages, including storm damage, on EI 333A after the Effective Date of the Letter Agreement.

## FACTUAL BACKGROUND

3.     Devon, Phillips Petroleum Company ("Phillips")[2] and Forest Oil Corporation ("Forest") are or were successors to the lease and Operating Agreement ("JOA") dated February 1, 1973, governing EI 333.  Devon was and still is the operator of EI 333 and, at that time, had a 76% working interest, Phillips a 10% working interest and Forest a 13.333% working interest.

---

[1] The EI 333 property contained 2 platforms.  The A platform and wells are at issue and will be noted as EI 333A.
[2] On July 1, 2003, Phillips assigned its working interest in EI 333 to Devon.

4.     In 2002, Forest desired to relinquish its interest in EI 333.  After several months of negotiations between Forest and Devon, Forest agreed to assign to Devon and Phillips all its right, title and interest to EI 333 and to retain its plugging and abandonment liability for wells, platforms and equipment on the Block *as of* December 1, 2000 (the "Effective Date").  In turn, Devon agreed to indemnify Forest for all damages on EI 333 relating to Devon's continued operation of the Block *subsequent to* December 1, 2000.

5.     Forest, Devon and Phillips executed a Letter Agreement dated February 15, 2002, effective as of December 1, 2000, and an Assignment to effect this agreement.  *See* Letter Agreement and Assignment, Exhibit "A."   The Twachtman Report was referenced and incorporated into the Letter Agreement to set forth the scope of Forest's plug and abandonment liability.  *See* Twachtman Report, Exhibit "B."  The JOA was also incorporated by reference into the Letter Agreement in order to set forth the manner in which operations and expenses relating to plug and abandonment were to be charged.  *See* JOA, Exhibit "C."

6.     The Twachtman Report identified the property and the condition thereof located at EI 333 (i.e., the platforms, wells, pipelines, etc.), the work to be performed (i.e., rigless abandonment, use of a derrick barge, crews quartered at platform A, etc.) and the cost to abandon the property.  According to the Twachtman Report, the total estimated Abandonment Expenses on EI 333A were $5,091,136.  Forest's share of those costs would be approximately $770,000 based upon the pre-assignment 13.333% working interest Forest had in EI 333.

7.     Devon continued to be the operator and working interest owner of EI 333 from February 15, 2002 forward.  *See* Enderlin Deposition (60:2-8), Exhibit "D."  From July 1, 2003 forward Devon received all revenue from production on EI 333 as the 100% working interest owner and likewise paid all expenses associated with EI 333.  *See* Hansen Affidavit, Exhibit "E."

8.      In March 2006 Mariner acquired Forest's interests in the Gulf of Mexico and, as such, succeeded to Forest's rights and obligations under the Letter Agreement. *See* Hanson Affidavit, Exhibit "E." Mariner never received any revenue from the Block nor did it pay any expenses associated with the Block until the costs at issue in this litigation were charged by Devon. *Id.*

9.      In September 2005, while Devon was operating the producing property, Hurricane Rita struck the Gulf of Mexico area. *Id.* The hurricane caused ***significant*** damage to EI 333, including toppling the A platform and bending the wells over. *See* Enderlin Deposition (69:12-18), Exhibit "D." Thereafter, Devon made the decision to abandon and decommission EI 333A rather than attempt to repair those facilities. *Id.*

10.     In November 2006, Devon began sending Authorization for Expenditures ("AFE") to Mariner which were allegedly for Abandonment Expenses on EI 333A. *See* AFEs, Exhibits "F," "G," and "H." The total estimated expenditure to abandon EI 333A as reflected in the AFEs is in excess of $125,000,000, ***far*** greater than the $5,091,236 figure contained in the Twachtman Report. The alleged cost to make safe, clean up, repair, and abandon EI 333A has increased since the issuance of the AFEs to approximately $200,000,000. *See* Enderlin Deposition (200:15-21), Exhibit "D."

11.     As previously noted, in March 2006 Mariner purchased all of Forest's assets in the Gulf of Mexico just months prior to its receipt of the EI 333A AFEs and subsequent Joint Interest Billings ("JIBs"). Consequently, during this transition period though August of 2006 Mariner was in the process of taking over hundreds of properties from Forest through 2006 and into 2007 and had not yet familiarized itself with the intricacies of EI 333. *See* Hansen Affidavit,

Exhibit "E." Mariner signed the AFEs and paid approximately \$5,000,000 to Devon in error.[3]
*Id.* The AFEs and accompanying cover letters that Devon sent represented that they were for
abandonment and that Mariner had a working interest in the Block. *Id.*

12. But, in fact, Devon is charging Mariner for 13.333% of costs of operations related
to Hurricane Rita damage that are in excess of \$200,000,000, gross. Mariner discovered this
issue through its audit department in late 2007. *See* Hansen Deposition (105; 25-106; 9), Exhibit
"L.". Mariner is liable only for costs attributable to Abandonment Expenses as outlined in the
Letter Agreement and the Twachtman Report. Devon, the 100% working interest owner of EI
333, is responsible for storm damage as outlined in the Letter Agreement and as clearly
expressed in the JOA.

13. The facts necessary to render a partial summary judgment to Mariner are
undisputed. Furthermore, the Letter Agreement and attachments thereto from which the claims
arise are not ambiguous nor has any party claimed ambiguity. Mariner is entitled to a partial
summary judgment as a matter of law as set forth herein.

## UNDISPUTED FACTS

14. The following facts are not in dispute:

- Forest, Phillips and Devon executed a Letter Agreement dated February 15, 2002,
  effective as of December 1, 2000, and an Assignment to effect that agreement.

- Per the Letter Agreement and Assignment, Forest assigned all right, title and
  interest to EI 333 effective December 1, 2000 and was no longer a party to the
  JOA.

- Mariner's liability, *aside* from plug and abandonment liability, ceased prior to the
  Effective Date of the Letter Agreement.

---

[3] Mariner has the right to audit the invoices and charges it received from Devon, whether paid or not, and to contest
those charges and payment thereof pursuant to the "Accounting Procedure Joint Operations" attached as Exhibit A
to the JOA, which the parties incorporated into the Letter Agreement for these purposes.

- On July 1, 2003, Phillips assigned its interest in EI 333 to Devon and Devon became the 100% working interest owner of the Block and, as such, received all production revenue and, likewise, paid all expenses associated with the Block.

- The Twachtman Report identified the property and the condition thereof located at EI 333 and estimated the total Abandonment Expenses on EI 333A were $5,091,136, with Forest's share of those costs being approximately $770,000 based upon the pre-assignment 13.333% working interest Forest had in EI 333.

- In June 2005, Mariner acquired Forest's interests in the Gulf of Mexico and, as such, succeeded to Forest's rights and obligations under the Letter Agreement.

- Mariner never received any revenue from EI 333 nor did it pay any operating expenses associated with EI 333 until the costs at issue in this litigation were charged by Devon.

- In September 2005, while Devon was operating the producing property, Hurricane Rita struck the Gulf of Mexico area.

- Mariner signed AFE No. 129333 to permanently abandon the wells on the EI 333A platform and AFE No. 129332 to abandon the A platform.

- The alleged cost to abandon the EI 333A platform, wells and pipelines is now in excess of $200,000,000 as a result of Hurricane Rita.

- The condition of EI 333A as of the Effective Date of the Letter Agreement was such that: 1) all 19 wells were upright and several of the wells were active and producing, 2) there was an 8 pile platform that was standing and through which production was processed, and 3) there were crew quarters on the platform that were utilized by the offshore workers working in and around the site.

- After Hurricane Rita, the "wells were bent over," there was "debris above the wells" and the "platform was toppled" and "rests on the seafloor."

- The Twachtman Report set forth work assumptions on how the plug and abandonment/decommissioning work would be performed.

- As a result of Hurricane Rita, only 1 of the 14 work assumptions actually took place.

- Devon considers the $200 million damages to the EI 333A platform, wells and pipelines to be storm damage.

- Devon Senior Vice President Jeff Agosta inquired into the difference between the amount of damages to EI 333A relating to plug and abandonment/decommissioning expenses, as opposed to make well safe expenses.

5

- Pursuant to the COPAS attachment to the JOA, costs and expenses from a storm should be charged to the Joint Account.

- Mariner is not a party to the Joint Account.

## SUMMARY JUDGMENT EVIDENCE

15.    Mariner's Motion for Partial Summary Judgment is supported by the following summary judgment evidence which is attached hereto and incorporated herein by reference:

| | | |
|---|---|---|
| - | Exhibit "A" | Letter Agreement and Assignment |
| - | Exhibit "B" | Twachtman Report |
| - | Exhibit "C" | JOA |
| - | Exhibit "D" | Deposition Testimony of Tim Enderlin |
| - | Exhibit "E" | Affidavit of Judd Hansen |
| - | Exhibits "F," "G," & "H" | AFEs |
| - | Exhibit "I" | Affidavit of Steve Taylor |
| - | Exhibit "J" | E-mail from Jeff Agosta to Steve Minor |
| - | Exhibit "K" | Affidavit of Howard Blunk |
| - | Exhibit "L" | Deposition Testimony of Judd Hansen |

-

## ARGUMENT AND AUTHORITIES

**I.    Louisiana Law Applies To The Letter Agreement**

16.    This matter is governed by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, which provides that the applicable law is that of the state adjacent to the site. *Amoco Production Co. v. Forest Oil Corp.*, 844 F.2d 251, 253 (5th Cir. 1988).  The property at issue is located offshore Louisiana, thus, Louisiana law applies.

6

17.     *Amoco* involved issues similar to the present case. At issue in *Amoco* was the interpretation of a Letter Agreement between Amoco and Forest which related to operations on Eugene Island 273. *Amoco*, 844 F.2d 252. The court determined that federal jurisdiction was predicated on OCSLA and thus, the applicable law was that of the adjacent state. *Id.* at 253. As such, the court applied Louisiana law to interpret the Letter Agreement. *Id*

18.     Under Louisiana law, "interpretation of a contract is the determination of the common intent of the parties." La. C.C. art 2045; *Naquin v. Louisiana Power & Light Co.*, 943 So.2d 1156, 1161 (La. Ct. App. 2006). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046; *Naquin*, 943 So.2d at 1161. In such cases, "the contract's meaning and the intent of the parties must be sought within the four corners of the document and cannot be explained or contradicted by extrinsic evidence." *Chailland Business Consultants v. Duplantis*, 897 So.2d 117, 123 (La. Ct. App. 2004).

19.     "Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 742 (5th Cir. 1998) (*citing* La. C.C. art. 2050). "Contract provisions susceptible to different meanings should be interpreted to avoid neutralizing or ignoring any of them or treating them as surplusage." *Id.* "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in a contract are fairly explicit." *Id.* "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." *Id.* (*citing* La. C.C. art. 2053).

**II.    Mariner Is Entitled To A Declaratory Judgment That Its Liability For Plug and Abandonment/Decommissioning Is Limited To The Conditions On The Block As Of The Effective Date Of The Letter Agreement And By The Work Assumption Scope Of Work Set Forth In The Twachtman Report**

**A.    The Letter Agreement**

20.    Applying these rules of construction to the Letter Agreement necessitates a finding that Mariner's share of liability for plug and abandonment/decommissioning is limited to the condition on EI 333 as of the Effective Date of the Letter Agreement and to the work assumption/scope of the work outlined in the Twachtman Report.

21.    The Letter Agreement provides, in pertinent part: 1) that Forest assigned all of its interest in EI 333; 2) that Forest remained liable for pre-effective Date liabilities; 3) that Forest would only be liable for its proportionate share of plugging and abandonment, subject to the terms of the JOA; and 4) that Forest is only liable for plugging and abandonment/decomissioning of facilities on EI 333 as of the Effective Date and only as outlined in the Twachtman Report.

> Forest agrees it will assign immediately all its right, title and interest in the Block [EI333], effective December 1, 2000 ("Effective Date") to Devon.
>
> -------------------------------
>
> Forest agrees that it will remain obligated to Devon and Phillips under the JOA for its share of all liabilities arising out of its ownership in the Block and its participation in operations conducted on the Block **prior to the Effective Date**. (Emphasis added.)
>
> -------------------------------
>
> Devon and Phillips agree that Forest will not be obligated to pay its share of such plugging and abandonment costs on the Block, including but not limited to removal and abandonment of platforms, wells, equipment on the Block ("Abandonment Expenses") until the time such abandonment operations commence on the Block for the amount then due at the time that the Abandonment Expenses are incurred, in accordance with the COPAS attached to the JOA.
>
> -------------------------------
>
> Devon and Phillips further agree that Forest will be liable only for its proportionate share of Abandonment Expenses **for wells, platforms and equipment on the Block as of the Effective Date and as outlined in the Twachtman Snyder & Byrd, Inc. Decommissioning Liability Report ("Twachtman Report"),** attached hereto as Exhibit "2" and incorporated herein by reference. **Any additional plugging and abandonment costs and other items not included in the Twachtman Report associated with new wells, platforms and equipment added on the Block after the Effective Date shall be for the**

*sole account of Devon and Phillips only.* The parties acknowledge and agree that the Twachtman Report is only an estimate of decommission costs as of the Effective Date and that all parties will bear their share of actual Abandonment Expenses under the JOA regardless of whether such Abandonment Expenses are higher or lower than the estimate contained in the Twachtman Report. (Emphasis added.)

*See* Letter Agreement, Exhibit "A."

22.     The Letter Agreement clearly limits Mariner's liability for Abandonment Expenses to the condition on EI 333 as of December 1, 2000. The condition of EI 333A as of this date was such that: 1) all 19 wells were upright and several of the wells were active and producing; 2) there was an 8 pile platform that was standing and through which production was processed; and 3) there were crew quarters on the platform that were utilized by the offshore workers working in and around the site. *See* Twachtman Report, Exhibit "B." *See also* Hansen Affidavit, Exhibit "E." These conditions existed on and before December 1, 2000 until September 2005, when Hurricane Rita struck EI 333.

23.     After Hurricane Rita, the condition of EI 333A changed dramatically. By Devon's own admission, the "wells were bent over," there was "debris above the wells" and the "platform was toppled" and "rests on the seafloor." *See* AFEs, Exhibits "F," "G," and "H." In fact, the storm damage inflicted by Hurricane Rita caused such havoc on EI 333A that Devon decided to abandon the property rather than repair it.

24.     It is undisputed that the condition of EI 333A dramatically changed as a result of Hurricane Rita. Because Mariner is only liable for Abandonment Expenses as defined in and limited by the Letter Agreement, the operations and costs associated with storm damage may not be charged to Mariner.

9

**B.     The Twachtman Report**

25.     Devon, as operator, engaged Twachtman Snyder & Byrd, Inc. ("TSB") to develop a decommissioning estimate and report for EI 333. See Twachtman Report, Exhibit "B." Such reports are routinely used in the oil and gas industry to set forth a "scope of work" and a cost estimate based upon that scope. *See* Affidavit of Steve Taylor, Exhibit "I." The Twachtman Report set forth the "scope of work" to abandon the EI 333 Property. *See* Enderlin Deposition (73:2-23; 79:23-80:1; 82:13-19), Exhibit "D." *See also*, Taylor Affidavit, Exhibit "I."

26.     The Twachtman Report set forth a description of the wells (i.e., well number, slot, type and status) in addition to information on the platform (i.e., function, piles, number of wells and pipelines and trawling radius). *See* Twachtman Report, Exhibit "B," Section 3, Page 1. The Twachtman Report also indentified the following assumptions:

- Both EI 333 platforms are removed with the same derrick barge.

- Deck was set in one piece with a 500T Derrick Barge without equipment.

- A 2000T Derrick Barge is used for removal with most equipment in place.

- Deck padeyes are to be replaced or spreader arrangement.

- Conductor guides are removed at (-)231' and (-)170' elevations.

- Well P&A and Platform Removal Preparation crews can be quartered and fed, using the exiting quarters at "A" platform.

- Only one (1) mobilization and one (1) demobilization has been included for each service with the exception of "Cargo Barge Services" which are mobilized and demobilized as required.

- All mobilizations are assigned to "A" platform.

- All demobilizations are assigned to "B" platform.

- Removal preparation crew quarters on "A" production platform and uses a utility boat to perform work on the other platform.

- All piles must be drilled at the (+) 10 elevation and check for explosive gas.

- Conductors are explosively severed during the platform removal preparation or by DB.

- Cargo Barges are mobilized from and demobilized to the Morgan City area.

- Derrick Barge Contractor takes possession of and disposes of all platform components.

*See* Twachtman Report, Exhibit "B," Section 1, Page 1. Based upon this, TSB estimated the total cost plug and abandonment to decommission EI 333A was $5,091,136.

27.    The Twachtman Report is significant because it established how the plug and abandonment/decommissioning work was to be accomplished, as well as a cost to perform the plug and abandonment/decommissioning work. While the cost of such work could and would likely fluctuate due to inflation, cost of equipment, contractor cost and availability, etc., the manner in which the work would be performed, or "scope of the work" was fixed by the Twachtman Report. *See* Taylor Affidavit, Exhibit "I." A scope of work set forth in reports like the Twachtman Report is generally used and accepted in the industry as a standard of plug and abandonment/decommissioning liability. *Id.* And the parties adopted this scope of work in the Letter Agreement, expressly limiting Forest's liability to it.

28.    As a result of Hurricane Rita, the work outlined in the Twachtman Report could not be performed. In fact, of the 14 work assumptions identified above, ***only 1 actually took place***. *See* Enderlin Deposition (87:9-100:5), Exhibit "D."

29.    According to Devon, the cost to abandon EI 333A[4] also increased dramatically. The total cost that Devon erroneously characterizes as Abandonment Expenses is approximately $200,000,000. *See* Enderlin Deposition (200:5-21), Exhibit "D." Devon seeks to have Mariner

---

[4]   Devon characterizes all costs it incurred on EI 333 as Abandonment Expenses in the AFEs. As will be shown, *infra*, the majority of the costs relate to storm damage and not Abandonment Expenses.

11

pay 13.333% of that figure or approximately $25,000,000; *more than 40 times the estimate contained in the Twachtman Report.*

30.     The Letter Agreement and Twachtman Report set forth Mariner's limited liability for the Abandonment Expenses.  That liability is fixed by the condition of the property as of the Effective Date of the Letter Agreement and by the language of the Twachtman Report.  Devon's arguments to the contrary are without merit.

31.     Devon will likely try to avoid these limitations by focusing on two sentences in the Letter Agreement (rather than giving effect to the entire agreement as required by law).  These sentences follow:

> Devon and Phillips agree that Forest will not be obligated to pay its share of such plugging and abandonment costs on the Block, including but not limited to removal and abandonment of platforms, wells, equipment of the Block ("Abandonment Expenses") until the time such abandonment operations commence on the Block for the amount then due at the time that the Abandonment Expenses are incurred....
>
> ------------------------------
>
> The parties acknowledge and agree that the Twachtman Report is only as estimate of decommissioning costs as of the Effective Date and that all parties will bear their share of actual Abandonment Expenses under the JOA regardless of whether such Abandonment Expenses are higher or lower than the estimate contained in the Twachtman Report.

32.     Read without the context of the remainder of the Letter Agreement, Devon will ask the Court to hold Mariner liable for all expenses it incurred at EI 333A arguing that Mariner has to pay "the amount then due" and pay the Abandonment Expenses even if they were "higher or lower than the estimate contained in the Twachtman Report."   Aside from the fact that the Letter Agreement must be read and interpreted as a whole, *see Amerada Hess Corp.*, 145 F.3d at 742, Mariner agrees that the Abandonment Expenses could and almost certainly would fluctuate due to inflation and other factors.  That was the point.  *However, the condition of the property was set at the Effective Date.  Further, the work assumptions were set by the Twachtman*

***Report.*** The two sentences that Devon will likely focus upon would necessarily require this Court to ignore and nullify all the other critical provisions that limit Mariner's liability.

33.     Devon will also likely argue that the Twachtman Report does not set forth work assumptions or a "scope of work," but merely sets forth an inventory of wells, platform etc.  This argument would be contrary to the language of the Letter Agreement: "and as outlined in the Twachtman Report..." and is contrary to the testimony elicited from Devon's corporate representative, Tim Enderlin.   Enderlin agreed several times in his deposition that the Twachtman Report set forth the "scope of work." *See* Enderlin Deposition (73:2-23; 79:23-80:1; 82:13-19), Exhibit "D." Furthermore, the Twachtman Report does not simply list or itemize the facilities on the site, it sets forth the manner in which the actual plugging and abandonment work contemplated by the parties to the Letter Agreement was to be performed.  Lastly, it is industry standard for reports such as that rendered by TSB to set forth the "scope of work" so any argument that the Twachtman Report is merely an inventory must fail. *See* Taylor Affidavit, Exhibit "I."

34.     Consequently, there is no genuine issue of material fact and Mariner is entitled to a declaratory judgment as a matter of law that its liability for Abandonment Expenses is limited to the condition of the property as of December 1, 2000, and by the Twachtman Report.

**III.   Mariner Is Entitled To A Declaratory Judgment That Mariner Is Not Liable For Storm Damage**

**A.     Devon Admitted That The Expenses At EI 333A Were For Storm Damage**

35.     Devon characterized the damages at EI 333A as Abandonment Expenses in the AFEs it sent to Mariner.  *See* AFEs, Exhibits "F," "G" and "H."  This characterization was necessary because, per the terms of the Letter Agreement, Mariner ***only*** retained liability for Abandonment Expenses, a fact not in dispute by either party.  However, the true nature of the

expenses incurred by Devon relate to ***storm damage***, not abandonment.[5]  This was admitted by

the corporate representative of Devon, Tim Enderlin, during his deposition:

> Q. ***How much of the 200 – approximate $200 million did Devon consider to be storm damage?***
>
> A. Well, I mean, I don't know if I can answer that. ***I guess the entire amount.***

*See* Enderlin Deposition (209:14-18), Ex. "D."

36.    Jeff Agosta, Senior Vice President, Corporate Finance, and Treasurer for Devon,

also understood the difference between storm damages and Abandonment Expenses as evidenced

by the following e-mails from Mr. Agosta to Mr. Enderlin:

> Tim,
>
> Do you have a breakout of how much the P&A was on the 3 wells at EI 333A that we had accounted for at 86.67% (afe #129333)?  ***That is, how much of the total $84MM was related to P&A only (i.e. no MWS [Make Well Safe[6]])?***
>
> Thanks, mate.
>
> Jeff (Emphasis added.)

Mr. Enderlin responded to Mr. Agosta's e-mail indicating that he was forwarding the question to

Danny Morales.  Mr. Morales responded to Mr. Agosta as follows:

> For AFE 129333, there were 10 days (out of 238) and $3.5MM gross allocated to "Remove Debris, Survey Wells, and Access Wellheads"
>
> The remainder of the days and costs (228 and $76MM gross) were allocated to Returning Wells to Vertical and P&A.
>
> The AFE was routed with 100% GWI [gross working interest].

---

[5]  As addressed more fully, *infra*, Devon ***indemnified*** Mariner from damages that occurred after the Effective Date of the Letter Agreement.  It is undisputed that Devon was operating EI 333 when Hurricane Rita struck.   Thus, ***Devon owes Mariner indemnity*** for the expenses related to the storm damages; ***Devon cannot charge Mariner*** for such damages.

[6]  Devon made a claim on its primary and excess insurance policies for the storm damage in the Gulf of Mexico, including damage to EI 333A, under its Make Well Safe provision.  Devon recovered over $100,000,000 under the excess policy, *See* Enderlin Deposition (222; 11-223-13), Exhibit "D" and hundreds of millions of dollars under the primary policy.

Mr. Agosta responded as follows:

>  ***What was just the P&A portion,*** without the "returning wells to vertical"?

(Emphasis added.) A copy of the e-mail string is attached hereto as Exhibit "J."

37. Aside from Devon's own admission that the majority of the work done at EI 333A related to storm damage, the daily operation reports and other documents from various contractors who actually performed work at the site establish this fact as well. *See* Taylor Affidavit, Exhibit "I." These documents outline the work being performed and, for the most part, that works is related to storm damage and not plug and abandonment operations. *Id.*

38. A typical abandonment occurs when the physical configuration of the platform, pipelines and wells is unchanged. *Id.* If the configuration is altered, as with EI 333A after Hurricane Rita, work must be done either to return the platform, pipelines and wells to the pre-storm configuration or the work procedures must be changed so that abandonment can be initiated. *Id.* The work done to a physically altered platform is referred to as storm damage work. *Id.*

39. Mariner's liability, *aside* from plug and abandonment/decommissioning liability, ceased prior to the Effective Date of the Letter Agreement. Devon does not dispute this fact. Mariner did not even have an ownership interest in EI 333 after the Effective Date. *See* Letter Agreement and Assignment, Exhibit "A." As such, it could not be liable for storm damage.

**B.      Under the JOA, Devon Is Liable For Storm Damage.**

40. In addition to the fact that the Letter Agreement establishes that Mariner is not liable for storm damage, the "Accounting Procedure Joint Operations," attached as Exhibit A (known as "COPAS") to the JOA and incorporated into the Letter Agreement ***expressly states that Devon is liable for storm damage***.

Operator shall charge the Joint Account with the following items:

**7. Damages and Losses to Joint Property** (Emphasis in original.)

All costs or expenses necessary for the repair or replacement of Joint Property made necessary because of damages or losses incurred by fire, **flood, storm**, theft, accident, or other cause…. (Emphasis added.)

41.     The JOA and COPAS also provide that Devon was 100% owner of the Joint Property at the time of these damages:

"Joint Account" shall mean the account showing the charges and credits accruing because of the Joint Operations and which are to be shared by the Parties.

"Joint Property" shall mean the real and personal property subject to the agreement to which this Accounting Procedure is attached.

"Joint Operations" shall mean all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property.

"Parties" shall mean Operator and Non-Operators.

42.     These provisions unequivocally state that the costs and expenses from a storm (Hurricane Rita) should be charged to the Joint Account, an account of which Mariner is not a party. *See* JOA, Exhibit "C" and Affidavit of Howard Blunk, Exhibit "K." Mariner (through its predecessor, Forest) assigned all right, title and interest to EI 333 effective December 1, 2000. *See* Letter Agreement and Assignment, Exhibit "A." Mariner has not been charged with any expenses relating to the Joint Property from February 15, 2002 forward until the submission of the AFEs for Hurricane Rita damages. *See* Hansen Affidavit, Exhibit "E."

43.     In order to book costs to the proper parties, the type of cost incurred or damage sustained by the property must be identified. *See* Blunk Affidavit, Exhibit "K." Once identified, such costs and expenses can be booked to the proper parties pursuant to the JOA and any other relevant contracts. *Id.* The COPAS provisions outline the manner in which storm damages are

to be charged while the Letter Agreement outlines how the Abandonment Expenses are to be charged.

44. Expenses relating to a storm are borne by the Joint Account in accordance with COPAS. *Id.* If a party does not have an ownership interest in the property, it is not a party to the Joint Account and is not liable for such expenses. *Id.* Devon is the 100% working interest owner of EI 333 and Mariner has no ownership interest. *Id.* Consequently, Mariner is not a party to the Joint Account and storm damages cannot be charged to it. *Id.*

45. Further, since Hurricanes Rita and Katrina, and in response to industry request for guidance, the Council of Petroleum Accountants Societies created Model Form Interpretation 52 ("MFI-52"), Catastrophe-Related Costs. *Id.* This document was created to provide guidelines for handling catastrophe-related cost or for handling the accounting for cost when the effects of a catastrophe prevent normal accounting. *Id.* The purpose MFI-52 was to assist oil and gas companies in implementing the terms of the various COPAS model forms. *Id.* One issue addressed in MFI-52 is the difference in accounting activities associated with storm damage cost and those associated with abandonment. *Id.* To help clarify existing accounting practices, what COPAS describes as stabilization efforts are distinguished from abandonment as cost incurred before normal abandonment can be performed. *Id.*

46. These interpretations are used by industry in applying the accounting for, and performing the auditing against, costs incurred under the accounting procedure exhibits attached to and made part of joint operating agreements. *Id.* MFI-52 has been relied upon by Operators to account for the joint interest billing complexities that were presented by Hurricanes Rita and Katrina. *Id.* MFI-52 further supports the fact that storm damage is treated differently than plug and abandonment/decommissioning expenses.

47.     Abandonment Expenses are to be borne by Mariner and Devon as set forth in the Letter Agreement. *Id.* Pursuant to that agreement, Mariner, through Forest, retained 13.333% of the Abandonment Expenses as of the Effective Date of the Letter Agreement. Accordingly, 13.333% of the damages that relate to the abandonment operations should be charged to Mariner and the remainder to Devon.

48.     Devon has admitted that the majority of the damages incurred at EI 333A relate to storm damage. The COPAS provision provides that such damages are to be charged to the parties to the Joint Account; an account to which Mariner is not a party. Accordingly, there is no genuine issue of fact and Mariner is entitled to declaratory relief as a matter of law that it is not liable for storm damage.

## IV.    Mariner Is Entitled To A Declaratory Judgment That Devon Must Indemnify It For Damages, Including Storm Damage, On The Block After December 1, 2000.

49.     Devon is seeking to hold Mariner liable for storm damage which occurred after the Effective Date of the Letter Agreement and while Devon was operating EI 333 as a producing property. Pursuant to the terms of the Letter Agreement, however, Devon is required to indemnify and hold Mariner harmless from any and all such damages:

> **With the exception of the proportionate Abandonment Expenses assumed by Forest, Devon and Phillips agree to release, defend, indemnify and hold Forest harmless from and against any and all claims, courses [sic] of action, fines, penalties, damages, and judgments arising out of or related to operations on the Block subsequent to the Effective Date.** This Letter Agreement shall be binding upon and inure to the benefit of Forest, Devon, Phillips, and their respective successors and assigns.

*See* Letter Agreement, Exhibit "A." (Emphasis in original). It is ***undisputed*** that Hurricane Rita struck EI 333 after the Effective Date of the Letter Agreement and while Devon was the operator, performing operations on the Block.

18

50.     Devon may argue that the storm damage was not a result of its "operations." But, the term "operations" has been broadly construed by the Fifth Circuit in several jurisdictional cases to include any act on the Outer Continental Shelf that involves exploration, development, or production of minerals. *Amoco Production Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1207 (5th Cir. 1988); *EP Operating L.P. v. Placid Oil Co.*, 26 F.3d 563, 567–68 (5th Cir. 1994). Moreover, the courts have held that "operations" do not cease simply because production has halted (which it had not in the instant action). *EP Operating Co.*, 26 F.3d at 568.   In fact, in *Fluor Ocean Services, Inc. v. Rucker Co.*, 341 F. Supp. 757, 759 – 60 (E.D. La. 1972), the court held that a contract for the provision of labor and equipment to raise a drilling platform sunk during Hurricane Camille arose out of "operations" on the Outer Continental Shelf.   And, in *Dominion Exploration & Production, Inc. v. Ameron Intern. Corp.*, 2007 WL 4233562, 2 (E.D. La.), the court noted that the Fifth Circuit has broadly interpreted the term "operation" to include platforms affixed to the OCS and used to extract and transport minerals as well as construction of a platform and pipes to transport minerals, whether used currently or in the past to search for, discover, produce minerals out of the OCS.   In addition, the COPAS provision attached to this JOA defines "Joint Operations" as "all operations necessary or proper for the development, operation, protection and maintenance of the Joint Property." *See* JOA, Exhibit "C."   Lastly, but for Devon's continued operation of it, EI 333A would have long ago been removed, as contemplated in the Letter Agreement, and thus would not have been toppled by Hurricane Rita.

51.     In the present case, EI 333A was a fully operational platform through which production was processed and wells were producing up until the moment of the hurricane. Devon, as operator and 100% working interest owner, was operating EI 333A.   Per the terms of the JOA, Devon, as operator, had to "conduct all operations on the Joint Lease." *Id.*   Those

operations are defined on page 3 of the JOA as follows:

> **Operator [Devon] shall have exclusive charge, control and supervision of all operations hereunder and shall perform such acts as it may deem advisable or expedient and in the best interests of the parties hereto in connection with the exploration, development, production, treating and handling of Oil and Gas from the Joint Lease**....as Operator deems advisable....

*Id.* (Emphasis added.)

52.     EI 333A was damaged while Devon was performing operations on the Block after the effective date of the Letter Agreement.  The indemnity provision in the Letter Agreement was intended to protect Mariner against such damage since Mariner has *no interest* in the Block, had *no say in what operations* should be conducted on the Block, *never received any revenue* from the Block and had no say in when to abandon the Block.  Mariner is entitled to indemnity from the storm damage.

53.     Devon seeks to avoid the indemnity provision of the Letter Agreement by arguing that the damage caused by Hurricane Rita falls within the Abandonment Expenses excepted from the provision.  *See* Enderlin Deposition (63:15-64:3), Exhibit "D."  However, as set forth, *supra:* 1) the Letter Agreement excludes storm damage from Abandonment Expenses by application of the JOA's COPAS, Paragraph II.7; 2) the Letter Agreement excludes storm damage by incorporation of the Twachtman Report's scope of work; and 3) Devon itself admitted that the damage was storm damage.

54.     The indemnity provision therefore applies to the storm damage that occurred long after the Effective Date of the Letter Agreement and while Devon was operating EI 333.  Any other result would be unreasonable.  Should the indemnity provision not apply, as Devon argues, it would mean that Mariner, which has no working interest had no voice in how the property is operated and received no revenue, must pay expenses associated with damage to property which

is owned 100% by Devon. This interpretation would lead to an absurd result.

55.     Pursuant to the terms of the Letter Agreement, Devon is required to indemnify Mariner for damages on EI 333 after December 1, 2000, and that includes this storm damage.

## V.    The Fact That Mariner Signed The Well And Platform Abandonment AFEs Does Not Mean That It Is Obligated To Pay The Estimated Costs

56.     In September 2006, Devon sent Mariner two AFEs:   AFE No. 129333 to permanently abandon the wells (the "Well Abandonment AFE") on the EI 333A platform and AFE No. 129332 to abandon the A platform itself (the "Platform Abandonment AFE"). The Well Abandonment AFE was in the amount of $79,500,000 and the Platform Abandonment AFE was in the amount of $49,205,000.

57.     Mariner received these AFEs but did not receive the detailed procedures that generally accompany such an AFE. *See* Deposition of Hansen Deposition (76; 10-81; 10), Exhibit "L." Nor did Mariner have the JOA at that time. *See* Hansen Affidavit, Exhibit "E" Approximately six months after receipt of the AFEs, Mariner received the procedures (or at least was informed generally of some procedures) and on April 16, 2007, Judd Hansen, on behalf of Mariner, signed both the Well Abandonment AFE and the Platform Abandonment AFE.[7] *See* AFEs, Exhibits "G" and "H."

58.     Devon will likely argue that since Mariner signed the AFEs, it is bound to pay the cost set forth in each AFE. However, an AFE is merely a cost estimate as evidenced by the fact that both AFEs state "Total Cost Estimate." *See*, Taylor Affidavit, Exhibit "I." Moreover, since Mariner did not have a working interest when it signed the AFEs, it was not a party to the JOA

---

[7] The AFEs Mariner received from Devon indicated that Mariner had a working interest in the Block and were for Abandonment. Further, Mariner had just recently taken over all of Forest's properties in the Gulf of Mexico and was not yet familiar with all of the intricacies of EI 333A or the other hundreds of properties Mariner acquired from Forest. *Id.* In fact, Mr. Hansen, the Mariner representative that signed the AFEs, was not aware of the existence of the Letter Agreement but instead thought Mariner actually had a working interest in the Block. *Id.*

21

and the AFEs, standing alone, did not create a binding contract. *See Sonat*

      *Exploration Co. v. Mann*, 785 F.2d 1232, 1233 (5th Cir. 1986).

     59.    In *Sonat*, the operator of a gas well sought to recover drilling expenses from certain non-operators who had signed AFEs, but were not parties to the operating agreement covering the well at issue. *Sonat*, 785 F.2d at 1233. The court held that the AFEs, standing alone, did not create a legally binding obligation on the non-operators to pay the expenses, noting that "an AFE is merely an estimate of costs without binding effect in the industry." *Id.* at 1235.

     60.    Devon may also argue that it relied upon Mariner's signature on the AFEs to proceed with the work done at EI 333A. However, Mr. Enderlin testified that Devon would have proceeded with the work anyway. *See*, Enderlin Deposition (135; 25-236; 10), Exhibit "D." Moreover, Devon was required by the Minerals Management Service to plug and abandon/decommission the EI 333 property, regardless whether it would bill Mariner or not. 30 C.F.R. §250.1703. Consequently, there was no detrimental reliance by Devon. *See, Sonat,* 785 F.2d at 1233. (The court further found no detrimental reliance by the operator as a result of the non-operators' signing the AFEs, noting that the signing of the AFEs "did not cause [the operator] to do anything it would not otherwise have done.")

     61.    Devon may also contend that Mariner is estopped or has waived any right it may have to refuse payment under the AFEs since it signed them. However, as set forth, *supra*, Mariner has no obligation under the Letter Agreement or any attachments thereto for storm damages. Further, the doctrines of waiver and estoppel do not operate to create new contractual obligations. *See, Shintech, Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144, 153 (Tex. App. -

Houston [14th Dist.] 1985, no writ)[8] "The doctrine of waiver involves the relinquishment of a known right against another party; it does not operate to create a new contractual obligation. The doctrine of waiver is defensive in nature. It cannot be used to create liability where it does not otherwise exist." *Id.; Jones v. Texas Gulf Sulfur Co.,* 397 S.W.2d 304, 307 (Tex.Civ.App. - Houston [1st Dist.] 1965, writ ref'd n.r.e.).") *See also Southwest Craft Center v. Heilner,* 670 S.W.2d 651, 656 (Tex. App.-San Antonio 1984, writ ref'd n.r.e.)(Promissory estoppel does not create a contract where one previously did not exist.) *See also Dairyland County Mut. Ins. Co. v. Mason,* 460 S.W.2d 481, 486 (Tex. Civ. App. – Beaumont 1970, writ ref'd n.r.e.) ("Similarly, the doctrine of equitable estoppel...does not of itself create a new right or give a cause of action. It operates always as a shield and never as a sword. 28 Am. Jur.2d, Estoppel and Waiver, S 33, p. 637.") Thus, Mariner is not obligated under any legal or equitable theory to pay the AFEs.

62.     Even if Devon could argue under some legal or equitable theory that Mariner's execution or partial payment of the AFEs could constitute some new contract, waiver, or estoppel, which is denied, Mariner would nevertheless be allowed to reject storm damage under the audit provision of the JOA. The JOA and COPAS are incorporated by the Letter Agreement to govern the subject operations and expenses. The JOA's COPAS provides: 1) that all charges by Devon are subject to audit and exception by Mariner, *see* COPAS I.5; and 2) that Devon is liable for storm damage, *see* COPAS Paragraph II.7.

---

[8]   Under Louisiana law, equitable estoppel is defined as the effect of the voluntary conduct of a party whereby he is precluded from asserting rights against another who has justifiably relied on such conduct and changed his position so that he will suffer injury if the former is allowed to repudiate the conduct. *Bunge North America, Inc. v. Board of Commerce & Industry and Louisiana Economic Development*, 991 So.2d 511, 520 (La. Ct. App. 2008). Estoppel is not favored in Louisiana law. *Id.*

Waiver is the relinquishment of a known right, power, or privilege. *L.T. v. Chandler*, 917 So.2d 753, 757 (La. Ct. App. 2005). The elements of waiver are: (1) an existing legal right; (2) knowledge of the existence of that right; and (3) either (a) an actual intention to relinquish the right, or (b) conduct so inconsistent with the intent to enforce the right so as to induce a reasonable belief that the right has been relinquished. *Arceneaux v. Amstar Corp.*, 921 So.2d 189, 192 (La. Ct. App. 2005).

## CONCLUSION

For the reasons stated herein, Mariner is entitled to summary judgment declaring that is liability for Abandonment Expenses is limited as of the Effective Date of the Letter Agreement and by the Twachtman Report.  Mariner is further entitled to summary judgment declaring tht it is not responsible for storm damage.  Mariner is also entitled to summary judgment declaring that Devon owes it indemnity for any damage, including storm damage, after the Effective Date of the Letter Agreement.  Finally, the fact that Mariner signed the AFEs does not affect the limitation of its liability under the Letter Agreement.

WHEREFORE, Plaintiffs Mariner Energy, Inc. and Mariner Energy Resources, Inc. pray that its Motion for Partial Summary Judgment be granted as set forth herein and also pray for such other and further relief as the Court may deem just, necessary, proper or equitable.

Respectfully submitted,

By:   /S/ Bradley L. DeLuca_____
    Bradley L. DeLuca
    Federal Bar No. 11510
    TBA No. 05653800
    Brigid D. Ashcraft
    Federal Bar No. 9033
    TBA No. 01372450

**ATTORNEYS FOR PLAINTIFFS
MARINER ENERGY, INC. AND
MARINER ENERGY RESOURCES,
INC.**

OF COUNSEL:

JOHNSON DeLUCA KENNEDY & KURISKY, P.C.
4 Houston Center, Suite 1000
1221 Lamar Street
Houston, Texas 77010
(713) 652-2525 - Telephone
(713) 652-5130 - Facsimile

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 15th day of June, 2009, a true and correct copy of the foregoing instrument was served on the following counsel of record in accordance with the Federal Rules of Civil Procedure.

Jack. O'Neill
Mark White
DLA Piper US LLP
600 Travis, Suite 1700
Houston, Texas 77002


/s/ Bradley L. DeLuca
Bradley L. DeLuca

25