**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

MARINER ENERGY, INC., *et al.*,    §
                              §
          Plaintiffs,     §
                              §
v.                                §     CIVIL ACTION NO. H-08-0658
                              §
DEVON ENERGY PRODUCTION CO.,   §
                              §
          Defendant.    §

**MEMORANDUM AND ORDER**

After a natural disaster, such as a hurricane, litigation often follows to determine who will pay for the consequences. This is such a case. When Hurricane Rita struck the Texas and Louisiana Gulf Coast area in September 2005, it damaged Eugene Island 333 ("EI 333"), an oil and gas block on the Outer Continental Shelf. The decision was made to abandon part of the block, EI 333 A, which required that it be "decommissioned." The decommissioning cost much more than it would have before the hurricane and resulting damage. The increase is from an estimated $5,091,136 before to approximately $200,000,000 after the hurricane. The issue in this suit is whether a prior owner is contractually responsible for its share of all the abandonment costs.

The plaintiffs, Mariner Energy, Inc. and Mariner Energy Resources, Inc., (together, "Mariner"), acquired the Gulf of Mexico interests of Forest Oil Corporation, including its share of liability for the abandonment costs. Mariner has sued the present owner of EI 333, Devon Energy Production. Forest Oil Corporation was one of three owners of EI 333 until February 2002; Devon and Phillips Petroleum were the other owners. Under an agreement executed in February 2002, Devon and Phillips assumed Forest Oil's ownership share of EI 333 effective December 1, 2000.

Under the agreement, Forest Oil remained liable for its proportional share (13.333%) of the "Abandonment Expenses" when they were occurred.

By September 2005, when Hurricane Rita hit, Devon had assumed full ownership of EI 333 and Mariner had acquired Forest Oil's oil and gas interests in the Gulf of Mexico, including its liability for the abandonment expenses. Devon and Mariner dispute the extent of Mariner's liability under the agreement executed by Devon, Phillips, and Forest Oil in February 2002. Both sides agree that the agreement is unambiguous and should be interpreted as a matter of law.

The following motions are pending:

- Both Devon and Mariner have filed motions for partial summary judgment on contract interpretation. Devon argues that the unambiguous language of the 2002 agreement makes Mariner liable for Forest Oil's share of the actual expenses incurred in abandoning the platform. (Docket Entry Nos. 30, 34, 46). Mariner argues that the unambiguous language of the agreement limits its responsibility to costs based on the block's condition on the effective date and the scope of work as outlined in a report attached to the contract, and that Devon is responsible for any storm damage costs after the effective date. (Docket Entry Nos. 32, 37, 47).

- Mariner has moved to strike several of the exhibits attached to Devon's summary judgment motion as extrinsic evidence that should not be considered because the contract is unambiguous. (Docket Entry No. 40). Devon has responded, arguing that the evidence is admissible to explain the background circumstances, (Docket Entry No. 41), and Mariner has replied, (Docket Entry No. 45). Mariner does not dispute that extrinsic evidence of

background circumstances is admissible but contends that Devon's exhibits are offered to vary the meaning of unambiguous contract terms.

• Devon has moved to strike four of Mariner's summary judgment exhibits as inadmissible extrinsic evidence. (Docket Entry No. 41). Mariner has responded, arguing that the exhibits are admissible because they are not offered to alter, vary, or add to the meaning of the contract. (Docket Entry No. 51). Devon has replied. (Docket Entry No. 53).

• Mariner has moved to strike any portions of the four deposition transcripts offered by Devon that were not referenced in Devon's briefing. (Docket Entry No. 44). Devon has responded. (Docket Entry No. 52).

• Finally, Mariner has asked for rulings on objections it made during the four depositions that Devon has attached as summary judgment exhibits. (Docket Entry No. 49). Devon has responded. (Docket Entry No. 54).

Based on the pleadings; the motions, responses, and replies; the summary judgment record; and the applicable law, this court grants Mariner's motion for partial summary judgment and denies Devon's motion for partial summary judgment. Both motions to strike extrinsic evidence are granted in part and denied in part. Mariner's motion to strike the unreferenced deposition testimony is denied. Mariner's deposition objections are sustained in part and overruled in part. A status conference is set for **February 25, 2010 at 9:00 a.m.** in Courtroom 11-B.

The reasons for these rulings are explained in detail below.

## I.    The Record

The relevant facts are undisputed. Effective February 1, 1973, Mobil Oil Corporation, Burmah Oil Development, Inc., Mesa Petroleum Co., Pennzoil Offshore Gas Operators, Inc., and

Pennzoil Louisiana and Texas Offshore, Inc. acquired the lease rights to EI 333 from the United States government.  (Docket Entry No. 32, Ex. C at 1).  The parties entered into a Joint Operating Agreement (the "JOA") on February 1, 1973.  Mobil was designated in the JOA as the "Operator" of EI 333.  (*Id.*).  As operator, Mobil was to maintain a Joint Account to which all joint operating expenses would be charged and all joint income (other than proceeds from sale of oil and gas) would be credited.  (*Id.* at 4).  A set of accounting procedures for administration of the Joint Account, based on a standard form created by the Council of Petroleum Accountants Societies ("COPAS"), were attached to and incorporated into the JOA.  (Docket Entry No. 32, Ex. C, Att. A).

Under the JOA, "[p]latforms constructed for the Joint Account and intended for use in the joint development and operation of the Joint Lease . . . shall be owned in proportionate shares." (Docket Entry No. 32, Ex. C at 23).  With limited exceptions, "[a]ll costs, risk, and expense incurred with respect to platforms and facilities . . . [would] be charged to the Joint Account."  (*Id.*).  The JOA specified that if the owners of EI 333 agreed in writing that "no further use will be made of any jointly owned platform or facilities in connection with operations on the Joint Lease," the equipment or platform "may be removed from the Joint Lease by the Operator as a charge to the Joint Account." (Docket Entry No. 32, Ex. C at 24).

Federal law requires that offshore oil and gas facilities be "decommissioned" when no longer useful for operations.  Decommissioning means permanently plugging all wells, removing all platforms and other facilities, including pipelines, and clearing the seafloor of obstructions.  *See* 30 C.F.R. § 250.1703.  The work must be consistent with safety and environmental protection. "Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations."  Such obligations accrue when a well is drilled; a platform, pipeline,

4

or other facility is installed; or a lease under which such obligations have accrued is assumed.  30 C.F.R. §§ 250.1701, 250.1702.

The rights to the EI 333 lease were transferred over time by various assignments.  In 2001, EI 333 was owned by Devon, Phillips, and Forest Oil.  Devon, the operator, owned a 76 % share; Phillips 10%; and Forest Oil 13.333%.  As of July 2001, three platforms, seven pipelines, twenty-nine wells, and other equipment were installed at EI 333.

Forest Oil decided to withdraw from ownership of EI 333.  On February 15, 2002, Forest Oil, Devon, and Phillips entered into a Letter Agreement by which Forest Oil assigned its interest in EI 333 to Devon and Phillips.  The Letter Agreement stated as follows:

> This Letter Agreement is our mutual agreement and understanding regarding Forest Oil Corporation's ("Forest") desire to relinquish its interest in Eugene Island Block 333 (OCS-G 02317 Lease) (the "Block").  Forest agrees it will assign immediately all its right, title and interest in the block, effective December 1, 2000 ("Effective Date"), to Devon Energy Production Company, L.P. ("Devon") and Phillips Petroleum Company ("Phillips") proportionally as to each of their respective working interest shares.  The assignment shall be in the form attached to this Letter Agreement as Exhibit "1" and incorporated by reference.
>
> Notwithstanding anything to the contrary contained herein as to that certain Operating Agreement ("JOA") dated effective February 1, 1973 for the Block, or any other document. . . Forest agrees that it will remain obligated to Devon and Phillips under the JOA for its share of all liabilities arising out of its ownership in the Block and its participation in operations conducted on the Block prior to the Effective Date.  Devon and Phillips agree that Forest will not be obligated to pay its share of such plugging and abandonment costs, including but not limited to removal and abandonment of platforms, wells, equipment on the Block ("Abandonment Expenses"), until the time such abandonment operations commence on the Block for the amount then due at the time that the Abandonment Expenses are incurred, in accordance with the COPAS attached to the JOA.  Forest acknowledges that it has assumed its share of such plugging and

5

abandonment liability under the JOA from Forcenergy, Inc., its predecessor in title to the Block.

Devon and Phillips further agree that Forest will be liable only for its proportionate share of Abandonment Expenses for wells, platforms, and equipment on the Block as of the Effective Date and as outlined in the Twachtman Snyder & Byrd, Inc. Decommissioning Liability Report ("Twachtman Report"), attached hereto as Exhibit "2"and incorporated by reference.   Any additional plugging and abandonment costs and other items not included in the Twachtman Report associated with new wells, platforms, and equipment added on the block after the Effective Date shall be for the sole account of Devon and Phillips only.  The parties acknowledge and agree that the Twachtman report is only an estimate of decommissioning costs as of the Effective Date and that all parties will bear their share of actual Abandonment Expenses under the JOA regardless of whether such Abandonment Expenses are higher or lower than the estimate contained in the Twachtman Report.

Abandonment operations shall be governed by and Abandonment Expenses charged and paid pursuant to the JOA.  Abandonment operations shall include, but not necessarily be limited to, the removal and or abandonment of all platforms, wells, structures, facilities, production equipment, pipelines, and flowlines on said Block.  Certain non-consent well operations that may have occurred on the Block by Forest prior to the Effective Date, that would ultimately require additional costs to plug and abandon at the time of the final abandonment operations, will be adjusted in accordance with the COPAS agreement attached to and made a part of the JOA.

This Letter Agreement may not be assigned or conveyed by Forest except (i) in the case of a merger by Forest into another entity or (ii) in the case of the sale of all or substantially all of Forest's Gulf of Mexico assets.   Any attempt by Forest to assign this Letter Agreement, except as provided in the circumstances described above, shall cause this Letter Agreement to terminate and cause Forest to owe immediately and to pay its share of the Abandonment Expenses to Devon and Phillips as if Forest had surrendered the Block to Devon and Phillips on the Effective Date pursuant to Section XXII of the JOA.

**With the exception of the proportionate Abandonment Expenses assumed by Forest, Devon, and Phillips agree to release, defend indemnify and hold Forest harmless from and against any and all**

> **claims, courses of action, fines, penalties, damages, and judgments arising out of or related to operations on the Block subsequent to the Effective Date.**  This Letter Agreement shall be binding on and inure to the benefit of Forest, Devon, Phillips, and their respective successors and assigns.

(Docket Entry No. 32, Ex. A (emphasis in original)).  The attached Assignment, also effective on December 1, 2000, recited consideration of one dollar "and other good and valuable consideration." (*Id.*, Ex. A, Ex. 1).  The other attachment, the Twachtman Report, sets forth decommissioning estimates for EI 333, which were prepared for Devon in June 2001.  The estimates were $5,091,136 to abandon Platform A, $4,306,518 to abandon Platform B, and $1,497,707 to abandon Platform C. (*Id.*, Ex. B).

The Twachtman Report described the abandonment work, as follows:

- Both EI 333 Platforms are removed with the same derrick barge.
- EI 312 "C" is removed with a smaller derrick barge.
- Deck was set in one piece with a 500T Derrick Barge without equipment.
- A 2000T Derrick Barge is used for removal with most equipment in place.
- Deck padeyes are to be replaced or spreader arangement [sic].
- Jackets are moved to EI 313 reef site (about 3nm away).
- Conductor guides are removed at (-)231' and (-)170' elevations.
- Well P&A and Platform Removal Preparation crews can be quartered and fed, using the existing quarters at "A" platform.
- Only one (1) mobilization and one (1) demobilization has been included for each service with the exception of "Cargo Barge Services" which are mobilized and demobilized as required.
- All mobilizations are assigned to "A" platform.
- All demobilizations are assigned to "B" platform.
- Removal preparation crew quarters on "A" production platform and uses a utility boat to perform work on the other platform.
- All piles must be drilled at the (+) 10' elevation and check for explosive gas.
- Conductors are explosively severed during the platform removal preparation or by DB.
- Cargo Barges are mobilized from and demobilized to the Morgan City area.

7

- Derrick barge Contractor takes possession of and disposes of all platform components.

(Docket Entry No. 32, Ex. B).

In June 2005, Mariner acquired Forest Oil's offshore interests in the Gulf of Mexico.  It is undisputed that Mariner assumed Forest Oil's remaining obligations under the Letter Agreement and the JOA.

In September 2005, Hurricane Rita struck EI 333.  The storm damaged the EI 333 A platform and attached wells.  Devon, as operator and by that time sole owner, decided to carry out the decommissioning process by removing platform A and plugging the wells.  After Mariner confirmed by e-mail that it had assumed Forest Oil's liability for 13.333% of the abandonment costs, Devon sent Mariner two separate Authorization for Expenditure ("AFE") documents, one for the platform abandonment costs and the other for the well plugging costs.  The AFEs stated that the cost estimates for the work were $49,205,000 to remove the platform and $79,500,000 to plug the wells. The well AFE stated that based on Mariner's 13.333% liability, it owed $4,184.210.53 in abandonment costs for each of the thirteen wells (out of nineteen wells involved in the abandonment) in which it had an interest.  (Docket Entry No. 30, Exs. N–P).

The total price tag on the decommissioning project  is now closer to $200,000,000.  (Docket Entry No. 32, Ex. D, Enderlin Depo. at 200).  The Twachtman Report had estimated the total cost of decommissioning EI 333 A, wells included, at $5,091,136.  Mariner's 13.333% share of $200,000,000 is approximately $25,000,000.

It is undisputed that the wide gap between the Twachtman Report estimate and the actual abandonment expenses is attributable to the damage caused by Hurricane Rita.  The AFEs Devon sent to Mariner stated that the platform and wells had been severely damaged by Hurricane Rita and

listed specialized services and equipment that would be necessary as a result. Judd Hansen, Mariner's Senior Vice President of Shelf and Onshore, signed both AFEs and returned them to Devon, authorizing the work proposed. Devon began the decommissioning work and sent monthly invoices to Mariner. For several months, Mariner made monthly payments within the 30-day window provided by the COPAS accounting procedure, amounting to $8,269,107.74.

On February 12, 2008, Mariner sent Devon a letter contesting the obligation to pay the amounts billed. Mariner attached the Letter Agreement and stated that because "Hurricane Rita toppled the platform and bent the wells over," the "scope of work required to clear out the block" was significantly altered. (Docket Entry No. 30, Ex. B at 1). Mariner suspended payment of further invoices and reserved the right to seek reimbursement of money it had previously paid in error. Mariner acknowledged that it signed the AFEs and had paid some invoices, but explained:

> Mariner has reviewed the Letter Agreement and relevant documents and charges and is of the opinion that Mariner should only be responsible for its net share of the plugging and abandonment costs within the scope of work outlined in the Letter Agreement, in contrast to the additional costs relating to hurricane damage.

(*Id.* at 1).

Devon responded in a letter dated February 20, 2008. (*Id.*, Ex. U). Devon quoted from the Letter Agreement, reminding Mariner that it was obligated to pay its share of actual "Abandonment Expenses" even if they were higher than the amount estimated in the Twachtman Report. (*Id.* at 1). Devon demanded that Mariner resume paying for the actual decommissioning costs. (*Id.* at 2).

In this suit, Mariner seeks a declaratory judgment that under the Letter Agreement and the attachments, including the incorporated-by-reference Twachtman Report, its liability for the abandonment expenses on EI 333 A is limited to the conditions on the block as of December 1, 2000 and to the scope of work outlined in the Twachtman Report; that it is not liable for expenses related

to storm damage, which are the responsibility of the working interest owners; and that Devon must indemnify Mariner for storm damages sustained on the block after December 1, 2000. (Docket Entry No. 1). Devon counterclaimed for a declaratory judgment that Mariner is liable for its proportionate share of actual costs for abandoning the block, and asserting that Mariner breached its contractual obligation when it refused to continue paying under the AFEs. (Docket Entry No. 9).

This suit is proceeding in two phases. In this first phase, the parties conducted targeted discovery and filed motions for partial summary judgment asking this court to interpret the Letter Agreement to determine whether Mariner's liability for Abandonment Expenses is, as Mariner asserts, based on the conditions on the block as of December 1, 2000 and the scope of work outlined in the Twachtman Report, or, as Devon asserts, based solely on the actual costs of abandoning the block. The second phase would address accounting questions and any other remaining issues.

The parties completed the limited discovery and filed their cross-motions for partial summary judgment, (Docket Entry Nos. 31, 32). Both have drawn responses, (Docket Entry Nos. 34, 37), and replies, (Docket Entry Nos. 46, 47). Each party has also filed a motion to strike exhibits on the basis that they contain extrinsic evidence that should not be considered in interpreting what both parties agree is an unambiguous contract. (Docket Entry Nos. 40, 41). Both parties have responded, (Docket Entry Nos. 41, 51), and replied, (Docket Entry Nos. 45, 53). Mariner has also filed a motion to strike based on Devon's filing complete transcripts of certain depositions. Mariner would like this court to strike parts of those depositions that are not specifically referenced in Devon's briefing. (Docket Entry No. 44). Devon has responded. (Docket Entry No. 52). Finally, Mariner has moved for rulings sustaining objections it made on the record of depositions offered into the record by Devon. (Docket Entry No. 49). Devon has responded. (Docket Entry No. 54).

The parties' arguments are analyzed in detail below.

## II.   The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

The moving party bears a heavier burden when seeking summary judgment on a claim or defense on which it would bear the burden of proof at trial. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Id.* (emphasis in original); *see also Meecorp Capital Markets LLC v. Tex-Wave Industries LP*, 265 Fed. App'x 155, 157 (5th Cir. 2008) (per curiam) (unpublished) (quoting *Fontenot*, 790 F.2d at 1194).

## III.    Analysis

Both Devon and Mariner agree that the Letter Agreement is unambiguous. Both parties accuse the other of going beyond the four corners of the contract and introducing extrinsic evidence that is not properly considered in interpreting an unambiguous contract. This evidentiary dispute must be resolved first.

The parties agree that these issues should be addressed under Louisiana law. (Docket Entry Nos. 30 at 12-13; 32 at 6-7). Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331 *et seq.*, which is the jurisdictional basis for this case, a federal court is to apply the law of whichever state is adjacent to the relevant area of the Outer Continental Shelf. 43 U.S.C. §§ 1333(a)(1), (a)(2); *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 496 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 788 & n.8 (5th Cir. 2009) (en banc); *Amoco Production Co. v. Forest Oil Corp.*, 844 F.2d 251, 253 (5th Cir. 1988).

12

The law of the adjacent state is adopted as "surrogate federal law" to the extent it does not conflict with federal law and federal maritime law does not apply of its own force.  43 U.S.C. §§ 1332(a)(1), (a)(2); *Grand Isle Shipyard*, 589 F.3d at 782-83, 789.  Louisiana is adjacent to EI 333.  Neither party contends that Louisiana law is inconsistent with or superceded by relevant federal law.  Moreover, the JOA provides that Louisiana law governs any disputes between the parties relating to "the intent and legal interpretation" of the JOA.  (Docket Entry No. 32, Ex. C at 40).

### A.    The Evidentiary Objections and Motions to Strike

Under Louisiana law, contracts are interpreted based on the "'common intent of the parties.'" *Coury v. Moss*, 529 F.3d 579, 585 (5th Cir. 2008) (quoting LA. CIV. CODE art. 2045).  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  LA. CIV. CODE art.2046.  "[E]xtrinsic evidence cannot be used to negate or vary the unambiguous terms of a written contract." *Gebreyesus v. F.C. Schaffer & Associates, Inc.*, 204 F.3d 639, 642 (5th Cir. 2000) (applying Louisiana law).  Courts interpreting unambiguous contracts are generally limited to the four corners of the document.  *Steier v. Heller*, 732 So.2d 787, 792 (La. Ct. App. 1999).  Devon and Mariner agree that the Letter Agreement is unambiguous.  Both parties agree that, as a result, the meaning of the contract and the intent of the parties must be determined without reference to extrinsic evidence.  Each party accuses the other of violating that principle.

### 1.    *Devon's Objections*

Devon objects to Exhibits D, I, J, and K to Mariner's summary judgment motion.  Exhibit D is a series of excerpts from the deposition of Timothy Enderlin, a Devon construction superintendent.  In its summary judgment briefing, Mariner cited Enderlin's deposition as support for its argument that the Twachtman Report sets forth the "scope of work" to abandon the EI 333

Property.  (Docket Entry No. 32 at 10).  Devon argues that because the term "scope of work" appears nowhere in the Letter Agreement or Twachtman Report, Mariner's use of Enderlin's testimony would improperly add a term to the Agreement.  Mariner responds that Enderlin's testimony is an admission by Devon that contradicts its litigation position that the Letter Agreement's reference to, and incorporation of, the Twachtman Report did not describe the scope of work in abandoning the platform.  To the extent that Enderlin's testimony is not offered to supplement or modify the Letter Agreement, but to explain the use in the oil and gas industry of reports that set out a decommissioning estimate, the objection is overruled.  Those portions of the deposition will remain part of the record.

Exhibit J is a series of e-mail messages between Devon employees from April 2008 discussing the cost of work done on EI 333 A.  The e-mail chain begins with Jeff Agosta, a Devon Senior Vice-President, asking Enderlin how much of the cost was related to "P&A"—plugging and abandonment—and how much was attributed to "make well safe," or nonabandonment costs.  (*Id.*, Ex. J).  Mariner offers the correspondence to show that "prior to the initiation of this lawsuit, Devon itself distinguished between expenses resulting from storm damage and expenses resulting from abandonment operations." (Docket Entry No. 51 at 7).  In its reply, Devon cites Agosta's deposition testimony that the purpose of the e-mail discussion was to determine what Devon could claim under its "Make Well Safe" insurance policy, as well as his testimony that he considered all of the $200 million Devon spent on EI 333 A to be part of the abandonment operations required by federal law. (Docket Entry No. 53 at 7).[1]

---

[1]    Five of the objections raised in Mariner's motion for a ruling on deposition objections come from Agosta's deposition.  These objections, numbered 19-23, all relate to a series of questions by Devon's counsel about what part of the $200 million spent on EI 333 A qualified as "Abandonment Expenses."  The basis of the objections was that the questions attempted to elicit a legal conclusion.  These objections are overruled.

This e-mail chain cannot be used as extrinsic evidence of the meaning of the terms "Abandonment Expenses" and/or "abandonment operations" in the Letter Agreement.  The Letter Agreement defines "Abandonment Expenses" as "plugging and abandonment costs on the Block, including but not limited to removal and abandonment of platforms, wells, equipment on the Block." (Docket Entry No. 32, Ex. A).  The Agreement defines "abandonment operations" to "include but not necessarily be limited to, the removal and or [sic] abandonment of all platforms, wells, structures, facilities, production equipment, pipelines, and flowlines." (*Id.*).  Neither party contends that these definitions are ambiguous.  It is improper to introduce the e-mails to modify or limit the definitions.  *See Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1327 (5th Cir. 1994) (Louisiana's "established rule of strict construction does not allow the parties to create ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties.").  To the extent the e-mails are offered for such a purpose, the objection is sustained.

Exhibits I and K are expert affidavits.  Under Louisiana contract law, expert testimony is subject to different rules than other extrinsic evidence.  Because, in contracts involving technical matters,  "words of art and technical terms must be given their technical meaning," rather than their ordinary meeting, LA. CIV. CODE. art. 2047, expert testimony can be used to explain the meaning of technical terms.  *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 281-82 (5th Cir. 1987), *cert. denied*, 484 U.S. 851 (1987) ("Under the substantive law of Louisiana, the technical meaning of the technical terms used in the [contract] was relevant. . . .  What better way is there to discover the technical meaning than through the use of Federal Rule of Evidence 702.").  This is true even when

---

The questions asked for the witness's understanding about how Devon treated or categorized certain costs. Similar questions were by opposing counsel on the same subject.  The objections are overruled.

a contract is unambiguous.  *Id.*  Devon agrees with this general statement of Louisiana law but

argues that "Mariner is attempting to use the affidavits at issue to *introduce* terms into the letter

agreement, rather than interpret them.  (Docket Entry No. 53 at 3 (emphasis in original)).

Expert testimony must satisfy Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

FED. R. EVID. 702.  Devon does not appear to challenge the qualifications of Mariner's experts.  The

issue is whether the expert testimony is relevant and helpful to the contract interpretation issue.

Mariner's first expert is Steve Taylor, an engineer with extensive experience in the oil and

gas industry.  Mariner retained Taylor to "determine whether [Devon] followed typical abandonment

practices and billing methodologies that are accepted within the oil and gas industry in actions of

the type involved in this dispute."  (Docket Entry No. 32, Ex. I at 2).  Taylor states that an

abandonment cost estimate is typically based on an "outline of the work type and process to be

performed," which is "routinely referred to as a 'scope of work' in the oil and gas industry."  (*Id.*

at 3-4).  Taylor opined that the Twachtman Report sets out the "scope of work" for the future

abandonment of the block.  Taylor also reviewed the work reports for the actual abandonment work

done on EI 333 A and found that it bore "minimal compliance to the routine rigless work type and

process 'scope of work' shown in the Twachtman Report."  (*Id.* at 6).  Taylor concluded that the

change was attributable to the storm damage from Hurricane Rita, which "is separate and distinct

from routine rigless abandonment of the wells (for example as outlined in the Twachtman Report

16

work type and process 'scope of work')." (*Id.*). In Taylor's experience, abandoning undamaged platforms, pipelines, or wells is referred to as "a typical or routine abandonment/decommissioning operation," while "the work done to a physically altered platform, pipeline, or well is referred to as storm damage work" (*Id.* at 7). After damage such as that inflicted by Hurricane Rita, to comply with the abandonment regulations, the operator can either return the facility to its pre-storm condition and then carry out the ordinary abandonment operation or carry out a modified abandonment operation on the damaged facility. (*Id.*).

Devon objects that Mariner is using Taylor's testimony to insert the term "scope of work" into the Letter Agreement as a limit on liability for abandonment costs. Devon is correct that Mariner cannot use Taylor's expert testimony to add a term to the Letter Agreement or the incorporated Twachtman Report. Because both parties agree that the Letter Agreement is unambiguous, evidence of industry custom or usage—outside of interpreting technical terms in the Agreement—is not permitted. *See Gary v. Miami Corp.*, 546 So.2d 318, 320 (La. Ct. App. 1989) ("custom can only supply incidents to a lease or contract where the lease or contract is either silent or ambiguous on the point to which a party seeks to apply custom"); *see also* LA. CIV. CODE art. 2053 (instructing courts to rely on "usages," among other guides, when a contract provision is "doubtful"); *In re Katrina Canal Breaches Litigation,* 495 F.3d 191, 207 (5th Cir. 2007) (discussing industry custom and usage to resolve contractual ambiguity).

Other uses of Taylor's affidavit are, however, proper. The affidavit is admissible evidence of industry custom and usage in understanding the meaning of technical terms in the Agreement and the incorporated Twachtman Report. For example, "Abandonment Expenses" is defined as "plugging and abandonment costs on the Block, including but not limited to removal and

17

abandonment of platforms, wells, equipment on the Block." (Docket Entry No. 32, Ex. A). This definition includes a technical term, "plugging and abandonment costs," that is otherwise undefined. Similarly, "abandonment operations" is defined in the Agreement as "includ[ing] but not necessarily [] limited to, the removal and or [sic] abandonment of all platforms, wells, structures, facilities, production equipment, pipelines, and flowlines." (*Id.*). The technical terms "removal" and "abandonment" are undefined. Taylor's testimony as to the distinction between storm damage work and routine abandonment work is admissible to explain the meaning of these technical terms.

Mariner's second proffered expert is Howard Blunk, an oil and gas accountant who is a past President of COPAS. His testimony is that industry standards require storm damage costs to be accounted for separately from abandonment costs. Storm damage cost "are costs necessary to restore the property to a productive state, or, if not possible, to restore the property to a rehabilitated and stable state such that abandonment can be performed." (Docket Entry No. 32, Ex. K at 5). "Abandonment costs resulting from a catastrophe arise from operations conducted once the rehabilitation/stabilization efforts have been undertaken as a result of storm damage." (*Id.*). Abandonment costs "are incurred only when the property has been restored to a stabilized state so actual abandonment operations may commence." (*Id.*). Blunk concluded that "Devon has presented joint interest billings containing both storm damage and abandonment costs. From an accounting perspective Mariner should not be billed storm damage costs as it is not a working interest owner in EI 333. Mariner does hold a [plugging and abandonment] liability, only, and Devon has not separately accounted for and presented to Mariner billings pertaining solely to such costs." (*Id.* at 6). Devon objects to Blunk's testimony on the ground that Mariner offers it to add "storm damage" as a term to the Letter Agreement.

18

While Mariner may not use Blunk's testimony to add "storm damage" as a term in the Agreement, Blunk's testimony is admissible to explain the meanings of "Abandonment Expenses" and "abandonment operations." Those technical terms are in the Agreement and are not fully defined. Blunk's affidavit suggests that the technical definitions of the terms are not the same as the definitions urged by Devon. *See Phillips Oil*, 812 F.2d at 281 ("Indeed, in this case, the admission of the expert testimony of the individuals experienced in the oil and gas accounting field for the purpose of obtaining explanation of the technical meaning of terms used in the net profits accounting provisions of the [contract] seems prudent."). This court will consider Blunk's affidavit for the purpose of defining those terms.

### 2. *Mariner's Objections*[2]

Mariner objects to Exhibits E, F, G, H, I, and J to Devon's summary judgment motion. Exhibit E is from the deposition of Stephen Minor, one of Devon's representatives in negotiating the Letter Agreement. (*See* Docket Entry No. 30, Ex. E). Minor's testimony describes the negotiating process. Mariner argues that this is improper because evidence of prior negotiations cannot be used to modify a final written contract. (Docket Entry No. 40 at 2). Devon agrees with that rule of law but contends that it should not apply because the testimony is not offered to "vary, alter, or contradict the express terms of the Letter Agreement" but only to explain the factual

---

[2]   Mariner has asked this court to rule on several objections it raised during the course of Judd Hansen's deposition. (Docket Entry No. 49).

Objections 11-16 in Mariner's motion assert that questions about Hansen's handling of the AFEs call for legal conclusions. These objections are overruled. Hansen was Mariner's corporate representative and was not asked to render opinions on legal issues.

Objection 17 is sustained. The question subject to objection called for speculation as to why another Mariner employee believed that Mariner was being billed for Lease Operating Expense on EI 333.

Objection 18 is also sustained on the grounds that the question called for Hansen to speculate as to the thoughts of another Mariner employee. The remaining objections raised in Mariner's motion are considered elsewhere in this opinion.

background.  (Docket Entry No. 41 at 2-3).  Devon cites the Minor deposition several times in the "factual background" section of its summary judgment brief.  Most of the cited passages clearly provide only background information, such as the statements that parties to a JOA share responsibility for decommissioning expenses in proportion to their lease interest, and that it is industry custom for a divesting leaseholder to reach an agreement with the remaining leaseholders over future decommissioning expenses.  As to such statements in the deposition, the objection is overruled.

One of the statements cited in Devon's briefing, however, goes beyond providing such background.  Devon cites Minor's deposition testimony for the proposition that "[t]he obligation of a party to pay its share of removal and abandonment expenses is the same regardless of whether the platform, wells and equipment are intact, damaged or torn apart and scattered across the sea floor." (Docket Entry No. 30 at 5).[3]  Minor, in addition to being a percipient witness, is an expert in the oil and gas industry who worked as a landman for 30 years.  There is no challenge to his qualifications. Minor's expert testimony about the industry usage of the technical terms "Abandonment Expenses" or "abandonment operations" is proper insofar as those terms are not defined in the Agreement.  LA. CIV. CODE art. 2053; *In re Katrina Canal Breaches Litigation,* 495 F.3d at 207; *Gary,* 546 So.2d at 320.[4]  Objections 4-10 in Mariner's motion for rulings on deposition objections, (Docket Entry No.

---

[3]   Mariner seeks to strike this testimony as objection 2 in its motion for rulings on deposition objections, (Docket Entry No. 49).  Mariner objected during the deposition on the grounds that the question called for a legal conclusion and for speculation.  These objections are overruled.  Based on his knowledge of the oil and gas industry, Minor may state whether, in his experience, removal and abandonment expenses are understood to vary based on the condition of the platform, wells, and equipment.  For the same reason, Mariner's objections  1 and 3 are also overruled.  The questions also solicit Minor's knowledge based on his experience in the industry.

[4]   Devon does not assert that it is offering Minor's testimony for this reason.  Devon's argument is that there is no need to use Minor's testimony or any other source to define "Abandonment Expenses" or "abandonment

49), which relate to questions in which Minor was asked to describe his understanding of the negotiating process or the terms of the contract, are overruled insofar as they assert speculation and best evidence and sustained insofar as they assert an improper use of extrinsic evidence of the deponent's intent in negotiations to prove the meaning of the contract.

Mariner's second objection is to Devon's Exhibit F, a June 18, 2001 letter from Forest Oil to Mariner.  (*See* Docket Entry No. 30, Ex. F).  In the letter, Forest Oil stated that it is "unnecessary at this time to consent and approve" the operations outlined in the Twachtman Report but that "we do acknowledge our responsibility in all future abandonment costs."  (*Id.*).  Devon cites this letter in arguing that Forest Oil "agreed to retain its share of all liabilities, including abandonment liabilities, for the platform, wells, and facilities."  (Docket Entry No. 30 at 6).  This letter is offered as improper extrinsic evidence of the parties' preexecution understanding of the contract.  The objection is sustained.

Mariner also objects to Devon's Exhibits G, H, I, and J, which are part of an e-mail exchange between Forest Oil and Devon in June and August 2001.  (*See* Docket Entry No. 30, Exs. G, H, I, J).  These e-mails are part of the negotiations on the Letter Agreement.  This evidence of the parties' prior negotiations is inadmissible as extrinsic evidence of the meaning of the Agreement.  *National Tax Credit Partnership v. Manhattan Ltd. Partnership*, No. 90-0372, 1992 WL 167040, at *2 (E.D. La. Jun. 29 1992) ("The parol evidence rule excludes as irrelevant any prior negotiations or

---

operations" because those terms are defined in the Letter Agreement.  As explained above, however, there are undefined technical terms within the definitions given in the Agreement.

agreements by the parties leading up to the execution of a written agreement.").[5]  The objection to the e-mails as extrinsic evidence of the parties' negotiations and their contractual intent is sustained.

The motions to strike extrinsic evidence are granted in part and denied in part.[6]  The contract interpretation analysis proceeds, based on the admissible evidence.

## B.    Contract Interpretation

As an initial matter, this court agrees with Mariner that it did not waive its objection to the amount of the abandonment expenses it is liable to pay by signing the AFEs Devon sent and making some payments under their terms.  Devon did not respond to this issue other than to state in its reply brief that it did not believe it is part of contract interpretation.  Because the waiver issue goes to Mariner's ability even to raise the contract interpretation issue, and because Mariner raised it and briefed it, it is properly addressed at the outset.

The parties do not cite, and this court has not found, any Louisiana case addressing the effect of the execution of an AFE.  *See* Guy E. Wall, *Joint Oil and Gas Operations in Louisiana*, 53 LA. L. REV. 79, 109-10 (1992) ("no Louisiana case has addressed the effect of the execution of an

---

[5]   The parol evidence rule "prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing."  11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 33:1 (4th ed.).  This is narrower than the four-corners rule.  Evidence excluded on the basis of the four-corners rule is sometimes referred to as "parol evidence" for the sake of convenience.  *See, e.g., National Tax Credit Partnership*, 1992 WL 167040, at *2 (characterizing prior negotiations as parol evidence and excluding them as evidence); *Kirsch v. Pier New Orleans, Inc.*, 362 So. 2d 1182, 1184 (La. Ct. App. 1978) ("The parol evidence rule simply excludes as irrelevant any prior negotiations or agreements when the parties intend to integrate these into one writing.").

[6]   Mariner has also objected to Devon's inclusion in the record of full deposition transcripts rather than just excerpts.  (Docket Entry No. 44).  The motion to strike on that basis is denied.  In its briefing, Devon has provided the court with page citations to deposition transcripts, which is sufficient to satisfy the obligation of "pointing out" evidence to the court.  *See Celotex*, 477 U.S. at 325.  This court has not been left to ferret through the record.  Similarly, the portion of Mariner's motion for rulings on deposition objections that asks this court to rule on objections to questions that are not referenced in any of the parties' briefing is denied as moot.

AFE."). In *Sonat Exploration Co. v. Mann*, 785 F.2d 1232, 1235 (5th Cir. 1986), however, the Fifth

Circuit made an *Erie* guess that a Mississippi court would find that the AFEs, without more, "do not,

on their faces, create a legally binding obligation [] to pay." The court found "no case in which the

signer of an AFE has been held liable solely because of the execution of the AFE" and no

"secondary authority espousing such a result." *Id.*; *see also Cleverock Energy Corp. v. Trepel*, 609

F.2d 1358, 1360 (10th Cir. 1979) (noting that an AFE is "an estimate of costs without binding effect

in the industry."). There is no basis to conclude that the AFEs modified Mariner's contractual rights

or waived its ability to challenge its liability for the amounts described.

Although both Mariner and Devon agree that the Letter Agreement is unambiguous, they

disagree about what it means. Devon argues that Mariner is responsible for its 13.333% share of

the $200 million required to abandon the EI 333 A, with the exception of work to decommission

wells and pieces of equipment that were not in place on December 1, 2000. Mariner argues that its

liability is limited not only to the costs of abandoning the wells and equipment in place on that date,

but also to the costs based on the condition of the wells and equipment on that date and on the

"scope of work" described in the Twachtman Report. Mariner also argues that it is not required to

pay for any costs from storm damage and that the change in the condition of the wells and equipment

and in the scope of the decommissioning and abandonment work resulted from storm damage.

Under Louisiana law, "[e]ach provision in a contract must be interpreted in light of the other

provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE

art. 2050. "A cardinal rule in the construction of contracts is that the contract must be viewed as a

whole and, if possible, practical effect given to all its parts, according to each the sense that results

from the entire agreement so as to avoid neutralizing or ignoring any of them or treating them as

surplusage." *Lambert v. Maryland Casualty Co.*, 418 So.2d 553, 559 (La. 1982); *see also Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 743 (5th Cir. 1998) (interpreting Louisiana law) ("Each provision in a contract must be interpreted in light of other provisions giving each provision a meaning suggested by the contract as a whole and avoiding any interpretation that neutralizes or ignores any provision or treats it as surplusage."). "Some effect is to be given to every word or clause if possible for a court may not impute to the parties the use of language without meaning or effect." *Lambert*, 418 So.2d at 560.

In *Texas Eastern*, 145 F.3d at 739, the Fifth Circuit applied Louisiana law in interpreting a contract between Amerada Hess, an offshore natural gas producer, and Texas Eastern, a natural gas pipeline company that bought gas from Amerada Hess, transported it, and sold it to third parties. In 1982, the parties agreed Texas Eastern would buy all the gas produced on South Pass Block 89, one of Amerada Hess's offshore leases, for a 20-year term. During the contract period, the market price settled at a point much lower than the contract price. In 1995, Amerada Hess discovered a new gas reserve in Block 87, which was much larger than the reserve in the southern portion of Block 89 (after a 1992 contract amendment, the only part of Block 89 covered by the contract) and not subject to any fixed-priced contract. Amerada Hess attempted to use a substitution provision in its Texas Eastern contract to force Texas Eastern to buy the much greater amount of Block 87 gas instead of the smaller amount of Block 89 gas at the elevated contract price. This would have resulted in Texas Eastern buying twice as much gas under the contract over the 20-year term and paying Amerada Hess an additional $624 million. *Id.* at 740.

The substitution provision gave Amerada Hess the right to "substitute other gas for all or a portion of the gas hereunder and the right to deliver such substitute gas to [Texas Eastern] at

24

mutually agreeable points . . . , provided the substituted source contains reserves and deliverability equal to or in excess of the reserves under" Block 89.  *Id.* at 742.  Amerada Hess argued that this provision allowed it to substitute another gas source for Block 89 regardless of how much more gas that source contained, while Texas Eastern contended that it only permitted Amerada Hess to substitute the amount of gas that Block 89 would have produced.  The district court resolved the dispute in favor of Texas Eastern and the Fifth Circuit affirmed.  The Fifth Circuit did so without venturing outside the four corners of the document, finding the contract as a whole to be unambiguous.  The court looked first to the most natural reading of the substitution clause, reasoning that while the clause referred to both "substituted gas" and "substituted source," "it only refers to the right to substitute other gas and does not state or imply any right to substitute gas *sources*."  *Id.* at 743 (emphasis in original).  The "substituted source" phrase was only inserted as part of "a condition that must be satisfied in order to exercise the right to substitute gas."  *Id.*  The court also agreed that the right to substitute was limited to the production output of Block 89 by the words allowing substitution "for all or a portion of the gas hereunder."  *Id.*  Amerada Hess's reading, the court observed, could have the absurd consequence of forcing Texas Eastern to pay for "a virtually unlimited quantity of gas."  *Id.*

Finally, the Fifth Circuit considered the substitution arguments in light of the contract as a whole.  The contract stated that "nothing in this Agreement shall be construed to require [Amerada Hess] to sell and deliver to [Texas Eastern] or [Texas Eastern] to purchase or pay for on any day a quantity of gas in excess of the total quantity of gas per day which the wells on the leaseholds and/or lands covered by this Agreement are capable of producing into [Texas Eastern]'s line."  *Id.*  The court rejected Amerada Hess's argument that "leaseholds and/or lands covered by this Agreement"

included any sources that Amerada Hess might substitute for Block 89. Such an interpretation was improper because it would "wholly negate" the quantity limitation clause and render it "empty and meaningless." *Id.* at 743. Similarly, a provision identifying and describing in detail the gas areas that were part of the contract would be "reduced to surplusage if Amerada Hess could substitute new gas sources at will." *Id.* at 744. The court also noted that the parties had amended the contract in 1992 to eliminate Texas Eastern's obligation to buy gas from the northern part of Block 89, a concession for which Texas Eastern had paid $19.3 million. Amerada Hess's reading of the agreement would allow it to "substitute gas from the Northern Area of SP 89 and thus reduce the entire 1992 amendment to a nullity." *Id.*

The Letter Agreement states that "Forest will be liable only for its proportionate share of Abandonment Expenses for wells, platforms and equipment on the Block as of the Effective Date *and as outlined* in the Twachtman Snyder & Byrd, Inc. Decommissioning Liability Report." (Docket Entry No. 32, Ex. A at 2 (emphasis added)). The first part of this sentence – "for wells, platforms and equipment on the Block as of the Effective Date" – does not by itself mean that the Abandonment Expenses are limited to those required to abandon the wells, platforms and equipment in the condition they were in on December 1, 2000.[7] The plain meaning of the first part of this sentence, standing alone, is that the expenses are limited to the wells, platforms and equipment that were on the Block on that date, as opposed to the wells, platforms and equipment added later. But the sentence continues. The second part of the sentence states that Forest Oil's liability is limited

---

[7] This court is not persuaded by—and does not base this opinion on—Mariner's argument that this first part of the sentence limits its liability to paying abandonment costs based on the condition of the platform, wells, pipelines, and other equipment as of December 1, 2000. The effect of that part of the sentence is to limit Mariner's responsibility for abandonment costs to the items that comprised the block on that date.

to its share of the Abandonment Expenses not only for the wells, platform and equipment on the Block as of December 1, 2000, but also "as outlined" in the Twachtman Report.  The sentence imposes two separate limits on Forest Oil's, and now Mariner's, liability.  The second, independent limit, is that the Abandonment Expenses be "as outlined" in the Report.

Devon argues that the sentence taken as a whole means that the Abandonment Expenses are based on the "inventory" in the Twachtman Report of the wells, platforms, and equipment on the EI 333 as of December 1, 2000.  (Docket Entry Nos. 34 at 12-13; 46 at 5).  This interpretation reads the words "and as outlined" out of the sentence and gives no meaning to the second part of the sentence.  Instead, as Mariner argues, the word "and" creates a second and separate limit to Mariner's liability for Abandonment Expenses.  The natural reading of the entire sentence is that Mariner will be required to pay its share of those Abandonment Expenses that are for wells, platforms, and equipment present on the Block on December 1, 2000 *and* that are "as outlined in the Twachtman Report."

"Outline" is not a technical term or a word of art and  must be given its ordinary meaning. *See* LA. CIV. CODE. art 2047.  The dictionary definition of the noun "outline" is a "preliminary account of a project"; the transitive verb "outline means "to indicate the principal features or different parts of."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 838 (Merriam-Webster 1990).  This is in contrast to the meaning of the word "inventory," which is "an itemized list of current assets," such as "a catalog of the property of an individual or estate."  *Id.* at 636.  Devon's proposed contract interpretation both eliminates the conjunctive joining the two parts of the sentence, setting out separate limits on Forest Oil's liability, and makes the words "as outlined" in the second part of the sentence superfluous.  The contract interpretation that gives effect to the entire

27

sentence is that Forest Oil—now Mariner—is liable to pay its proportionate share of the Abandonment Expenses for the wells, platforms, and equipment in place as of December 1, 2000 based on the assumptions about the extent and nature of work set out in the Twachtman Report.

This definition is consistent with the contents of the Twachtman Report, which was incorporated by reference in the Letter Agreement. Devon's argument that the Twachtman Report is only an "inventory" of the wells, platforms, pipelines, and equipment on EI 333 as of December 2000 also ignores the contents of the Report. Only two of the Report's seven substantive pages are an inventory. Those two pages, which comprise section three of the report, are set forth to "summarize[] the platform data used to develop the decommissioning liability estimates." (Docket Entry No. 32, Ex. B). The remaining pages set out, in detail, how the plugging and abandonment/decommissioning work was to be performed and, based on the assumptions as to the scope and manner of work, how much it was estimated to cost. Those assumptions were detailed. They included that both platforms could be removed with the same derrick barge; a 2000T Derrick Barge could be used for removal; the crews could be quartered and fed using existing quarters on the "A" platform; and how the deck padeyes and conductor guides could be handled. Under Devon's interpretation of the Letter Agreement, only the two pages of the Twachtman Report listing the wells, platforms, and equipment are relevant, despite the fact that the Agreement incorporated the entire Report. Like the portion of the *Texas Eastern* contract that described the gas sources in detail, the portions of the Twachtman Report that "outlined" the abandonment work—and the clause of the Letter Agreement incorporating the Report by reference—would be "reduced to surplusage" if Devon could deviate from the outlined work at will. This construction of the Twachtman Report

28

and the "and as outlined" language supports Mariner's argument that its liability is limited to paying its share of the costs for the work "as outlined in the Twachtman Report."

Devon argues that giving this effect to the "and as outlined" clause would require "ignor[ing] the last two sentences of" the same paragraph. (Docket Entry No. 34 at 13). Those sentences are:

> 1.  Any additional plugging and abandonment costs and other items not included in the Twachtman Report associated with new wells, platforms, and equipment added on the block after the Effective Date shall be for the sole account of Devon and Phillips only.
>
> 2.  The parties acknowledge and agree that the Twachtman Report is only an estimate of decommissioning costs as of the Effective Date and that all parties will bear their share of actual Abandonment Expenses under the JOA regardless of whether such Abandonment Expenses are higher or lower than the estimate contained in the Twachtman Report.

(Docket Entry No. 32, Ex. A at 2).

The first of these two sentences raises no issue. The first sentence is consistent with the first part of the sentence in the Letter Agreement, that "Forest will be liable only for its proportionate share of Abandonment Expenses for wells, platforms and equipment on the Block as of the Effective Date. . . ." The consistent, expanded explanation in this first sentence is that Mariner has no responsibility to pay abandonment costs to decommission platforms, wells, pipelines, and other equipment added to the block after December 31, 2000. There is no internal inconsistency.

Nor is there an inconsistency with the second sentence. Mariner's liability is not limited to the Abandonment Expenses set out in the Twachtman Report; those expenses were explicitly recognized as an estimate that could be reduced or increased when the actual work was done. But the work had to be "as outlined" in the Report. Mariner is only liable for its proportionate share of the Abandonment Expenses incurred in performing the work "as outlined" in the Report. Mariner

must pay its proportionate share of what *that* work actually costs, "regardless of whether such Abandonment Expenses are higher or lower than the estimate contained in the Twachtman Report." The parties acknowledged that the actual cost could vary from the estimate, based on material and labor costs, for example, when the work was actually performed.  The parties did not acknowledge that the extent and nature of the decommissioning work could so fundamentally change.  The Letter Agreement is an "estimate of decommissioning costs," not of "decommissioning work."

Under Louisiana law, "[w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter." LA. CIV. CODE art. 2047.  Expert testimony may be used to show a term's technical meaning.  *Phillips Oil*, 812 F.2d at 281-82; *Kona Technology Corp. v. Southern Pacific Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (applying Texas law) ("we have recognized that a trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is 'prudent'") (quoting *Phillips Oil*, 812 F.3d at 281)); *Transportation Ins. Co. v. Professional Engineering Consultants, Inc.*, No. 00-0881, 2002 WL 34367717 (M.D. La. Jan. 15, 2002) ("Moreover, case law supports the use of expert evidence to assist the court in interpreting words of art or technical terms in a contract.").  The terms "Abandonment Expenses" and "abandonment operations" in the letter agreement are both technical terms.  *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996) (finding "meter station" to be a "technical term within the oil and gas industry"); *Reliance Ins. Co. v. Orleans Parish Sch. Bd.*, 322 F.2d 803, 806 (5th Cir. 1963) ("'Blanket policy' is a 'term of art.'").  The affidavits of both Steve Taylor and Howard Blunk address these terms.

Although the terms are defined in the Letter Agreement, expert testimony about their meaning is proper because the definitions refer to other, undefined, technical terms. "Abandonment Expenses" are defined as "plugging and abandonment costs," (Docket Entry No. 32, Ex. A), and "abandonment operations" are defined as "removal and or [sic] abandonment." (*Id.*). This leaves the technical terms "plugging and abandonment costs," "removal," and "abandonment" undefined.

Taylor's affidavit states that in the industry, abandonment work is not defined to include work required to respond to storm damage. Instead, the abandonment work to respond to storm damage "is separate and distinct from routine rigless abandonment of the wells," the type of work described in the Twachtman Report. (*Id.*, Ex. I at 6). In Taylor's experience, abandoning platforms, pipelines, or wells without the type of damage present after Hurricane Rita is "a typical or routine abandonment/decommissioning operation" and is what the Twachtman Report outlined. In contrast, "the work done to a physically altered platform, pipeline, or well is referred to as storm damage work," and was not outlined in the Twachtman Report. (*Id.* at 7). According to Taylor, once storm damage has occurred, to comply with the abandonment regulations, the operator can either return the facility to its pre-storm condition and then carry out the ordinary abandonment operation or carry out a modified abandonment operation on the damaged facility. The work required to bring a damaged facility to the state where abandonment operations can begin is not "abandonment work" as that term is used in the industry.

Blunk's affidavit states that "plugging and abandonment costs," a technical term used in the industry, means those costs required to comply with federal decommissioning regulations for platforms, wells, pipelines, and other equipment that are not damaged by such occurrences as

hurricanes.[8]  "Abandonment costs resulting from a catastrophe arise from operations conducted once the rehabilitation/stabilization efforts have been undertaken as a result of storm damage."  (*Id.*, Ex. K at 5).  Abandonment costs "are incurred only when the property has been restored to a stabilized state so actual abandonment operations may commence."  (*Id.*).  The costs incurred in restoring a damaged facility to its original, undamaged state are not "Abandonment Expenses."  (*Id.*).

This expert testimony provides further support for interpreting the Letter Agreement to limit Mariner's liability to its proportionate share of the expenses required to abandon the wells, platforms, and pieces of equipment that were on EI 333 A on December 1, 2000, based on the scope of work "as outlined" in the Twachtman Report.  Using Taylor's and Blunk's testimony does not, as Devon argues, improperly add new terms such as "storm damage" or "scope of work" to the Letter Agreement.  Instead, the testimony is helpful in clarifying the meaning of the technical terms used in the Letter Agreement and incorporated Twachtman Report.  Both Taylor's and Blunk's affidavits support Mariner's interpretation that the Abandonment Expenses and operations do not include the additional and different work, not outlined in the Twachtman Report, required to respond to the damage inflicted by Hurricane Rita.

Although Devon does not offer expert testimony for the purpose of defining these technical terms, it has submitted the deposition of Steve Minor.  Minor's testimony touches on the definitions of "Abandonment Expenses" and "abandonment operations."  Minor testified that, based on his experience, abandonment expenses "typically include all expenses to remove and decommission the platform and plug and abandon the wells . . . regardless of whether the platform and the wells are

---

[8]   The parties dispute the significance of MFI-52, a 2007 COPAS report attached to Blunk's affidavit dealing with the proper accounting procedures for Catastrophe-Related Costs.  Because it was published more than five years after the signing of the Letter Agreement, MFI-52 is irrelevant.

intact or whether they're damaged or whether they're lying all over the seafloor." (Docket Entry No. 30, Ex. E, Minor Depo. at 15). Minor's testimony, as applied to the Letter Agreement, makes meaningless the Agreement's provision that Mariner's liability is limited to its share of the Abandonment Expenses "as outlined" in the Twachtman Report. A contract must be read so as to "avoid neutralizing or ignoring any of [the terms] or treating them as surplusage." *Lambert*, 418 So.2d at 559.

Under the Letter Agreement, Mariner is responsible for paying its proportional share of the Abandonment Expenses for the wells, platform, and equipment that were in place on December 1, 2000 and for the scope of work "outlined" in the Twachtman Report. Mariner is not liable under the Letter Agreement for any further costs. This interpretation is consistent with the JOA and attached COPAS accounting procedures, under which Mariner is not required to pay for storm damage. Instead, costs for "repair or replacement" made necessary by a storm are to be charged to the Joint Account. (Docket Entry No. 32, Ex. C, Ex. A at 2). As Blunk explained, charges to the Joint Account are the responsibility of the "working interest owners," which, at the time of the hurricane, did not include Forest Oil or Mariner. (*Id.*, Ex. K at 4). The terms of the JOA are consistent with the interpretation of the Letter Agreement that Mariner's liability is limited to the work "as outlined" in the Twachtman Report, not for work required to respond to storm damage.

## IV. Conclusion

Mariner's motion for partial summary judgment is granted. Devon's motion for partial summary judgment is denied.

A status conference is set for **February 25, 2010 at 9:00 a.m.** in Courtroom 11-B.

SIGNED on February 11, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge